## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| MAHMOOD ALIZADEH, On Behalf of Himself and All Others Similarly Situated, | : Case No. 13-cv-1066 |
| | : |
| | : CLASS ACTION |
| Plaintiff, | : |
| | : |
| v. | : AMENDED COMPLAINT FOR |
| | : VIOLATIONS OF THE FEDERAL |
| TELLABS, INC., TIMOTHY J. WIGGINS, and THOMAS P. MINICHIELLO, | : SECURITIES LAWS |
| | : |
| | : |
| Defendants. | : DEMAND FOR JURY TRIAL |

Lead Plaintiffs Brian Jensen and Alfredo Acosta ("Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Tellabs, Inc. ("Tellabs" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, news articles, and analyst reports regarding Tellabs; (c) interviews with confidential witnesses; and (d) review of other publicly available information concerning Tellabs.

### NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of purchasers of Tellabs' securities between June 9, 2010 and April 26, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Tellabs designs, develops and supports telecommunications networking products. The Company generates revenue principally through the sale of these products to communications service providers worldwide as both stand-alone network elements and as elements of integrated solutions, and also generates revenue by providing services to its customers. At all relevant Times, the Company operated in three business segments: (i) Broadband; (ii) Transport; and (iii) Services.

3.      During the Class Period, Verizon and AT&T were Tellabs two largest customers, accounting for over 50% of Tellabs revenue. Since 2009, Tellabs lagged technologically compared to its competitors, and the Defendants became aware at that time that they had lost AT&T's business, and hence, the majority of Tellabs' revenue.

**Defendants' Unlawful Scheme to Defraud**

4.      Throughout the Class Period, Defendants engaged in a fraudulent scheme whereby they issued materially false and misleading statements and made material omissions regarding the status of its technology and the loss of its biggest customer, AT&T. This scheme enabled Defendant Wiggins to achieve $1.3 million in proceeds from stock sales during the Class Period at artificially inflated prices and to be awarded over $1.6 million in salary and incentive-based compensation during 2010.

5.      During the relevant time period, the Company was completely reliant on two customers, AT&T and Verizon for over 50% of Tellabs revenue. Tellabs' AT&T account was worth an estimated $400 million dollars. AT&T was a large buyer of Tellabs best-selling product, the 5500, which was aging and becoming obsolete.

6.      Tellabs had aging technology which could not keep up with its customers' current demands, including AT&T. Tellabs' 5500 product had been Tellabs' top selling product, and it

was the company's proverbial bread-and-butter for many years. In its heyday, the 5500 provided what was, at the time, a very fast bandwidth to customers. However, by the end of 2009, it was well known to Tellabs that the 5500 had already peaked and was in decline. The 5500 could not support the superfast bandwidth speed that customers now demanded, and, as a result, sales declined. Before and during the Class Period, service providers were moving away from technology called TDM networks to a more optimal technology referred to as Ethernet networks, also called Internet Protocol (IP). The 5500 supported only TDM network so the product was being phased out technologically by 2010. Confidential informants confirmed that the new technology that AT&T was moving toward in their networks did not require the 5500, which had been one of AT&T's largest volume purchases from Tellabs. Confidential Witness ("CW") 5, for example, said that Tellabs management knew that the 5500, an aging product, was a stop gap for AT&T until it made the switch to a "new technology solution."

7.  Then, on top of Tellabs' obsolete technology, in 2009, AT&T announced that it would only buy from "domain suppliers," and Tellabs was not included on AT&T's list of domain suppliers. As of that time, Tellabs knew that it would lose substantial sales from AT&T. As a result, Tellabs acquired WiChorus, Inc. in December 2009 as a means to develop new products to replace the old products AT&T had been purchasing. However, unfortunately, these new products failed miserably, as they weren't competitive in the market and never even met their development schedules. In the meantime, Tellabs had put all of their resources in WiChorus and made dramatic funding cuts for its own Research and Development, including its bread and butter product, the 8800. Tellabs, therefore, not only had no new products to offer from WiChorus, as they had promised to AT&T, but were unable to develop and continue to sell their own products internally.

8.     In 2010, as expected, Tellabs lost the AT&T account when it began to buy products only through the domain vendor, Juniper. Confidential Witnesses relayed that when AT&T told Tellabs in 2009 that it would only purchase from its domain suppliers, it offered Tellabs to partner up with Juniper to save its AT&T sales. However, Tellabs refused to get on board. Hence, on top of losing the 5500 because it was so antiquated, it also lost sales of the 8800 because Juniper had its own version of that product to sell. At that time, Tellabs management was discussing plans internally for cutbacks to deal with the major expected losses in AT&T sales revenue. Unfortunately, Tellabs left the investing public in the dark regarding its expected loss of sales; to the contrary, Tellabs continued to tout its ability to keep AT&T as a customer.

9.     At the beginning of the Class Period, therefore, it was clear to Defendants that Tellabs' products were obsolete and not competitive, and that it would lose its largest customer, AT&T, which accounted for 40% of Tellabs' broadband data sales and 20% of its total revenue in 2009 and roughly 35% of revenues in 2010. In communications with the public, however, Defendants continued to assure analysts and investors that it did not lose AT&T as a customer, and that it had products to compete with the current technology. Indeed, internally, it began to prepare for the loss of AT&T, but to the public, it claimed that no such loss was at risk.

10.    At the beginning of the Class Period, in June 2010, the Company, and specifically Defendant Wiggins, falsely disclosed that Tellabs has experienced "no degradations" in its sales to AT&T.

11.    Rather than disclose the truth about the collapse of Tellabs' earning potential, the persistent development problems with WiChorus, and its dramatic loss in revenue from AT&T that would result once AT&T switched domains, Defendants persisted in their fraudulent

conduct and covered-up the Company's resulting earnings and revenue projections. In the Fourth Quarter of 2010, Defendants executed a contract for the purpose of obfuscating the fact that the Company's revenues were seriously declining due to AT&T's departure. This contract dramatically boosted its revenue and consolidated earnings and concealed the impact of problems the Company was having with producing up-to-date technology and keeping AT&T as a customer. Without this contract, Tellabs 4Q10 earnings would have been cut by almost 10% exposing the impacts of its technology failures and AT&T's loss of business.

12. Throughout the Class Period, analysts covering Tellabs echoed Defendants' false and misleading statements and omissions and espoused the importance of the Company's new technology and ability to keep AT&T as a customer.

13. As a result of Defendants' materially false and misleading statements, Tellabs common stock traded at artificially inflated prices throughout the Class Period, reaching a Class Period high of $8.06 per share on October 25, 2010 (coinciding with its release of its third quarter financial results for 2010).

14. As detailed herein, several Tellabs employees raised concerns to Defendants regarding the loss of AT&T's business and its impact on revenue, as well as Tellabs inability to compete technologically with its peers. Nonetheless, even though these issues were well known to Tellabs and the individual Defendants, the Company recklessly continued to publish materially false and misleading statements regarding these issues, which, in turn, caused their financial statements and projections to be materially false and misleading, in violation of the Exchange Act.

15. Defendant Wiggins, while issuing false statements to its shareholders, privately netted close to $1.3 million in stock sales during the Class Period. Add that to his yearly salary

and benefits, of over $1.6 million in 2010 alone, he made out like a bandit with close to $3 million while his loyal shareholders at the same time lost over 20% of the value of their holdings.

16.     During the Class Period, and at the time Defendants made their statements regarding their technology advances, products in the pipe-line and revenue forecasts, they knew of, or recklessly disregarded, *inter alia*, the following material adverse facts:

>   (a) By 2009, Tellabs' existing products had aged and its top sellers were known to have an expiring shelf life. By the end of 2009, sales to customers, including AT&T, its largest customer, began to fall dramatically. At this time, AT&T announced that it did not need Tellabs current products, including its largest volume product, the 5500.

>   (b) In order to appease AT&T and in an attempt to develop new products for them, Tellabs acquired WiChorus in December 2009, which miserably failed. It did not develop any new products that were competitive in the market nor did it meet its development schedules to allow Tellabs to market any new replacement products for its obsolete technology.

>   (c) Later in 2009, AT&T announced that it would purchase its products from a domain supplier, which did not include Tellabs. As a result, Tellabs lost sales for the 5500 and the 8600/8800 products, having a severe impact on Tellabs sales and revenues. As a result, Tellabs had trouble meeting its revenue goals.

>   (d) AT&T increasingly refused to engage in new product testing, which was an indicator that AT&T would not be making any new purchases. Further, its purchases of existing products had also declined.

>   (e) Tellabs' own in-house Research and Development department did not advance its existing products nor did it development new products as a result of lack of funding. Tellabs put all of the R&D funding into WiChorus, which ultimately was unable to develop competitive products.

>   (f) In 2010, despite WiChorus's failure, the Company continued to market and sell unproduced products.

>   (g) During 2010, Tellabs' upper management began to prepare internally for major revenue losses due to AT&T's dropping sales.

>   (h) Throughout the Class Period, upper management was made aware of the fact that Tellabs' Research and Development was not meeting its benchmarks and that customers were not receiving products.

(i) In order to cover up its shortfall in sales from its loss of AT&T, Tellabs prematurely recognized revenue in the Fourth Quarter of 2010, and also reported inflated revenue to the market.

(j) As a result of the forgoing, all of Tellabs' revenue and sales projections were artificially inflated during the Class Period.

**Disclosure of Defendants' Class Period Fraud**

17.     Beginning with Tellabs' January 25, 2011 conference call, and continuing with the Company's issuance of a press release announcing its Q4 2010 financial results, investors slowly began to learn the truth about the Company's technology problems and its loss of AT&T as a customer.  For Q4 2010, Tellabs reported revenue of $410.5 million, purportedly in-line with the low end of its previously issued revenue guidance (of $410 to $430 million). That same day, however, during a conference call to discuss Tellabs' Q4 2010 financial results, the Company additionally disclosed that "revenue in [Q4 2010] also reflected [Tellabs'] agreement with a North American customer to add a data product to other Tellabs' products already sold to that customer through a distributor" and that as "a result, [the Company had] recognized $20.8 million in revenue in [Q4 2010] that otherwise would have been recognized in the first quarter of 2011 [("Q1 2011")]." Moreover, the Company admitted that when it "***set the guidance and provided it to [the public] in October [of 2010] ... [Tellabs had] anticipate[d] the change in this distribution arrangement with the customer.***"[1]

18.     To suppress negative investor reaction and allay concerns about losing AT&T as a customer, Defendants artificially boosted earnings for the Fourth Quarter of 2010. When adjusting Q4 2010 revenue to remove this unusual and out of the ordinary shift in revenue

---

[1] Unless noted otherwise, all emphasis is added.

recognition, after reporting revenue of $429.2 million for Q3 2010, *the Company's revenues actually substantially declined by $40 million, or 9.32%, to only $389.7 million in Q4 2010:*



19.     To further artificially boost earnings, Tellabs also included $9 million in revenue recognition due to an unanticipated accounting change and a cancelled order.  Analysts were perplexed by the Company's disclosures.  For example, a Morgan Keegan analyst, Simon Leopold, stated that "[t]he confusion affects 2011 as well, and leaves us with limited conviction regarding our estimates." (TLAB: 4Q10 Results, Messy Quarter Muddies Conviction, Lower PT; January 25, 2011). He also stated that "Management offered a poor forecast calling for Q1:11 sales of $315-$335 mm compared to the Street's $403 mm and our $392mm.  The timing of recognizing $20 million in Q4:10 vs. Q1:11, accounting changes, and a $17 mm inventory charge linked to an order cancellation distort comparisons."

20.     Further, J.P. Morgan analyst Rod Hall stated, in discussing the $9 million accounting change, "If we adjust for this accounting change, total underlying revenue at $401.7 m missed our estimate by 4.3% and consensus by 4%." *Tellabs: Q4'10 First Reaction: Miss and Poor Guidance, Transport slips Further* (Jan. 25, 2011).

21.     On the Tellabs' January 25, 2011 earnings call, Tellabs began to disclose its trouble with AT&T.  For example, CEO Pullen admitted that the Company's weaker Fourth Quarter 2010 growth "was primarily due to AT&T."  However, this did not disclose the full extent of the problem.

Your next question comes from the line of Mark Sue with RBC Capital Markets.

**Joseph Longobardi**

This is Joe Longobardi on for Mark Sue. Can you guys give us additional color as it relates to overall customer concentration? Your two largest customers, AT&T and Verizon, still account for greater than 50% of revenue? And just on the international front, are you seeing concentrations develop there? Or is the revenue base a bit more dispersed?

**Timothy Wiggins** - Chief Financial Officer and Executive Vice President

It's Tim. Let me just touch on customer concentration. In 2009, we had two customers that represent 51% of our business and we disclosed that was Verizon at about 30% and AT&T at about 21%. For 2010, those two customers, the concentration increased slightly to 53%. But they flipped positions, AT&T is 35% of our business in 2010, and Verizon is 18%. But I would note in 4Q that the customer concentration was down significantly to around 41%. In terms of the international, we do have some larger customers, where we -- relative to the other ones, we have many more customers internationally. A few of them represent a larger component. But nothing near the concentration that we see here in North America.

**Joseph Longobardi**

And are there any specific points that we could look at in order to give investors comfort in your overall position at AT&T?

**Robert Pullen** - Chief Executive Officer, President and Director

We'll we have shared with you last quarter that they introduced a new vendor in the Mobile Backhaul, that market share transition is happening. We are also participating in the LTE deployment. And that whole transition is reflected in our guidance both in the fourth quarter actual and the first quarter.

**Ehud Gelblum** - Morgan Stanley

And looking at your AT&T and Verizon mix down to 41%, I think you said in the fourth quarter. Was that primarily due to AT&T? You had hinted that they would be weaker in terms of their growth when you went into fourth quarter?

**Robert Pullen** - Chief Executive Officer, President and Director

Yes, it was primarily due to AT&T, Ehud.

**Ehud Gelblum** - Morgan Stanley

And would you expect them -- they basically shut down a lot of their spending to get to the end of the year, would you expect that to come back? I would think that, that would just be a budgeting issue and when we get past budgets in February, we might be back to the regular run rate, or do you think there's some sort of more permanent change?

**Robert Pullen** - Chief Executive Officer, President and Director
Well, we hope so. But we're just going through the budget cycle with them right now. And so we don't have great visibility yet.

22.     On this news, shares of Tellabs declined $1.35 per share, or almost 20%, to close on January 25, 2011, at $5.69 per share, on unusually heavy volume.

23.     However, the Company still did not reveal the truth regarding its known loss in the AT&T business.  For example, analyst Simon Leopold stated in his January 25, 2011 report referenced above, in discussing AT&T, stated that the magnitude of the decline is uncertain.  It may have been uncertain to analysts, but it certainly wasn't uncertain to Defendants. They knew that they had lost that business and that it wasn't coming back.

24.     There were scattered analyst reports regarding Tellabs' forecasts.  However, on April 26, 2011, the full truth was finally revealed when the Company issued a press release entitled "Tellabs first-quarter revenue totals $322 million." Therein, the Company, in relevant part, stated:

Naperville, Ill. - Tellabs' first-quarter 2011 revenue totaled $322 million, down 15% from $379 million in the first quarter of 2010.

On a GAAP basis, Tellabs recorded a net loss of $24 million or 7 cents per share in the first quarter of 2011, compared with net earnings of $46 million or 12 cents per share in the first quarter of 2010.

In the first quarter of 2011, Tellabs had a non-GAAP net loss of 3 cents per share, compared with net earnings of 11 cents per share in the year-ago quarter. Non-GAAP net loss was $11 million in the first quarter of 20 11, compared with net earnings of $44 million in the year-ago quarter. Non-GAAP results exclude $7.7 million pretax or 1.4 cents after-tax per share in equity-based compensation expense.

To pursue the long-term growth opportunity of the mobile Internet, Tellabs increased its research and development (R&D) investment by 16% year over year to $80 million, or 25% of first-quarter revenue.

"While international revenue grew 40% from a year ago, lower revenue in North America drove Tellabs' first-quarter results," said Rob Pullen, Tellabs president and chief executive officer. "Going forward, we will continue to invest in the smart mobile Internet through increased R&D spending to position Tellabs for long-term growth."

For the first quarter of 2011, Broadband segment revenue was $173 million, Transport segment revenue was $99 million and Services segment revenue was $50 million.

25.     On an earnings call that same day, Tellabs admitted that its disappointing financial results were the result of the loss of AT&T as a customer. Analysts finally understood what this meant.  For example, Morgan Stanley analyst Ehud Gelblum reported in an April 26, 2011 report entitled "Q1 QT: In-Line Topline But Gross Margin Gets Weaker: "TLAB is losing its air cover from the higher margin 5500 faster than originally expected…we have little faith TLAB can rev the growth engine in the near or midterms."  On this day, Analyst Lawrence Harris from CL King stated in a report entitled "Tellabs Disappoints Yet Again; AT&T a Major Contributor" that Transport sales were significantly below his previous estimate due to the decline of sales in the 5500 product.

26.     On this news, shares of Tellabs declined $0.49 per share, 9.09%, to close on April 26, 2011, at $4.90 per share, on heavy trading volume.

27.     Tellabs' lack of competitive products and decrease in purchases from AT&T continued to plague the Company well after the Class Period, as the stock never recovered and is currently trading in the $2.00 range.

28.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose pertinent information as stated in ¶16(a)-(j).  As a result of the above, the Defendants' positive statements about the Company's business, operations and prospects lacked a reasonable basis and/or were materially false and/or misleading when made.

29.     When the material misstatements and omissions as described herein were disclosed and the risk of losing AT&T materialized, Plaintiffs and members of the Class were damaged.

## JURISDICTION AND VENUE

30.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

31.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U. S. C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

32.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information,

occurred in substantial part in this Judicial District. Additionally, the Company maintains its principal executive offices within this Judicial District.

33.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

34.     Lead Plaintiff Brian Jensen purchased Tellabs common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

35.     Lead Plaintiff Alfredo Acosta purchased Tellabs common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

36.     Defendant Tellabs is a Delaware corporation with its principal executive offices located at One Tellabs Center, 1415 W. Diehl Road, Naperville, Illinois 60563.

37.     Defendant Timothy J. Wiggins ("Wiggins") was, at all relevant times, Chief Financial Officer ("CFO") and Executive Vice President of Tellabs.

38.     Defendant Thomas P. Minichiello ("Minichiello") was, at all relevant times, Vice President of Finance and Chief Accounting Officer of Tellabs.

39.     Defendants Wiggins and Minichiello are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Tellabs' reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and

institutional investors, *i.e.,* the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## CLASS ACTION ALLEGATIONS

40.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased Tellabs' securities between June 9, 2010 and April 26, 2011, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

41.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tellabs securities were actively traded on National Association of Securities Dealers Automated Quotations Market ("NASDAQ"). While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Tellabs shares were traded publicly during the Class

Period on the NASDAQ, and as of March 31, 2013, Tellabs had 355,580,000 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Tellabs or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Tellabs;

(c)     Whether the Individual Defendants caused Tellabs to issue false and misleading financial statements and false and misleading statements regarding the business, operations, and prospects of Tellabs;

(d)     Whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     Whether when the material misstatements and omissions as described herein were disclosed and the risk of losing AT&T materialized, Plaintiffs and members of the Class were damaged; and

(f)     To what extent the members of the Class have sustained damages and the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

46.     The market for Tellabs' securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Tellabs' securities traded at artificially inflated prices during the Class Period. On October 25, 2010 (coinciding with the Company's release of its financial results for the third quarter of 2010), the closing price of the Company's common stock reached a Class Period high of $8.06 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Tellabs' securities and market information relating to Tellabs, and have been damaged thereby when the material misstatements and omissions as described herein were disclosed and the risk of losing AT&T materialized.

47.     During the Class Period, the artificial inflation of Tellabs' stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Tellabs' business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Tellabs and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's securities. When the material misstatements and omissions as described herein were disclosed and the risk of losing AT&T materialized, Plaintiffs and members of the Class were damaged.

48.     At all relevant times, the market for Tellabs' securities was an efficient market for the following reasons, among others:

(a)     Tellabs stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Tellabs filed periodic public reports with the SEC and the NASDAQ;

(c)     Tellabs regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Tellabs was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

49.     As a result of the foregoing, the market for Tellabs' securities promptly digested current information regarding Tellabs from all publicly available sources and reflected such information in Tellabs' stock price. Under these circumstances, all purchasers of Tellabs' securities during the Class Period suffered similar injury through their purchase of Tellabs' securities at artificially inflated prices and a presumption of reliance applies.

## SUBSTANTIVE ALLEGATIONS

**Background**

**<u>Tellabs's Business</u>**

50.     Tellabs designs, develops and supports telecommunications networking products. The Company generates revenue principally through the sale of these products to communications service providers worldwide as both stand-alone network elements and as elements of integrated solutions, and also generates revenue by providing services to its customers. At all relevant times, the Company operated in three business segments: (i) Broadband; (ii) Transport; and (iii) Services.

51.     Tellabs's revenue was highly concentrated in one region and two customers. North America accounted for 66% of the Company's revenue in 2009, and Tellabs's two largest customers, AT&T and Verizon, accounted for over half of the Company's revenue in 2009 and 2010; during those years, no other customer accounted for more than 10% of consolidated revenue.  Specifically, sales from AT&T (including the former BellSouth and Cingular)

comprised 35% of Tellabs's consolidated revenue in 2010 and 21% in 2009; approximately 40% of the Company's Broadband data sales came from AT&T.

52.     Within the Broadband segment, Tellabs marketed data, access, and managed access products that facilitated mobile communications, wireline business services, and bundled consumer services.  The Company's data products were comprised of next-generation packet-switched products that enabled wireless and wireline carriers to deliver next-generation mobile voice and Internet services and wireline business services to their customers.  Data products included, among others, the Tellabs 8600 Managed Edge System (the "TLAB 8600"), the Tellabs 8800 Multiservice Router (MSR) Series (the "TLAB 8800), and the Tellabs SmartCore 9100 Platform (the "TLAB 9100").

53.     Within the Transport segment, Tellabs marketed optical networking systems, digital cross-connect systems, and voice-quality enhancement products.  These products enabled wireless and wireline service providers to manage network bandwidth by adding capacity when and where needed to support mobile services, business services for enterprises, and triple-play voice, video, and data services for residential consumers.  Transport products included, among others, the Tellabs 5500 Digital Cross-Connect (the "TLAB 5500"), used by every major service provider in North America.

**The Transition Away from Tellabs's Product**

54.     Tellabs was attempting to evolve from a business based primarily on the circuit-switched Time Division Multiplexing technology used in the Company's digital cross-connect and managed access products to a business based on the packet-switching and Internet Protocol ("IP") technology used in the Company's data and optical networking products.  This evolution

was taking place as service providers transformed their networks with next-generation capabilities.

55.     In other words, during the Class Period, service providers were in the process of transforming their networks from ones based on digital cross-connects (*e.g.*, the TLAB 5500) towards networks that were based on next-generation IP and Ethernet technology (*e.g.*, the TLAB 8600 and TLAB 8800).  Tellabs was attempting to evolve to reflect this change in the marketplace.

56.     While AT&T, like other service providers, were transitioning toward Ethernet-based networks, and transitioning away from cross-connect technology, growth in the smartphone market led to substantially higher traffic and data demands on AT&T's mobile network.  In 2010, as a temporary measure to bolster its backhaul[2] capacity and accommodate its increasingly data-hungry customers, AT&T purchased large volumes of the TLAB 5500. Although this led to higher sales of the 5500 in 2010, the Company this did not change the fact that AT&T was transitioning away from cross-connects and predicted that sales of the 5500 would likely decline later that year.  As the very profitable and popular TLAB 5500 was nearing the end of its life cycle, for Tellabs to maintain its level of revenue from AT&T, the Company's largest customer in 2010, AT&T would have to continue purchasing the Company's TLAB 8600 and TLAB 8800 products.

---

[2] According to Wikipedia, "[i]n a hierarchical telecommunications network the backhaul portion of the network comprises the intermediate links between the core network . . . and the small subnetworks at the 'edge' of the entire hierarchical network."

*See* http://en.wikipedia.org/wiki/Backhaul_%28telecommunications%29

**AT&T's Domain Supplier Program**

57.     At all relevant times, Tellabs supplied three main products for AT&T's wireless backhaul network: the TLAB 8600 aggregation router, the TLAB 8800 central office router, and the TLAB 5500 cross-connect.  During an earnings conference call on July 27, 2010, addressing the Company's Broadband data business with AT&T, Pullen stated: "the approved products at AT&T are the 8800 and 8600. . . .  We have a majority of market share at AT&T in this mobile backhaul."

58.     On September 4, 2009, AT&T announced that it was launching the Domain Supplier program, which would change the way that AT&T purchased products from its equipment and software providers, such as Tellabs.  AT&T would establish a number of technology domains, and each domain would have two or three suppliers selected and pre-qualified by AT&T to meet the company's current and future needs in that domain for a set multi-year period, though there would be no guarantee of any business award.  The domain relevant to Tellabs was the "IP/MPLS/Ethernet/Evolved Packet Core" domain, which covered the equipment used to route and forward IP packet traffic (voice, video, and data) through AT&T's network.

59.     Thus, the impact of AT&T's Domain Supplier program on Tellabs's sales was unclear, especially given that the IP/MPLS/Ethernet/Evolved Packet Core domain suppliers would not be officially announced until July 30, 2010.  However, what was still unknown during the Class Period was whether AT&T still favored the Company's TLAB 8600 and TLAB 8800 products, and whether AT&T would push for a partnership between Tellabs and one of the larger domain suppliers.

**Tellabs's Failed WiChorus Acquisition**

60.     As part of its efforts to appeal to AT&T and other service providers, in December 2009, Tellabs acquired a company named WiChorus for approximately $165 million.  During an investor conference in March 2010, CEO Pullen stated, "we acquired WiChorus to focus on the mobile packet core, all enabling the mobile Internet." CW 8 states that Tellabs made this acquisition mainly as a means to quickly develop new products and technologies for AT&T's mobile network.  When Tellabs acquired WiChorus, the latter had already developed a next-generation product for so-called "WiMax" networks, and the Company was seeking to extend that technology to the 3G and LTE networks used by AT&T and Verizon.  The WiChorus product became known as the TLAB 9100.

61.     However, WiChorus was unable to meet the needs of AT&T, and many Confidential Witnesses ("CW") have confirmed that Indeed, Tellabs and its most senior officers knew that it had lost AT&T's business and that its aging technology was unable to fulfill its customers' needs as early as 2009.

**Confidential Witnesses**

62.     CW 1 was the Director of Sales for the AT&T wireless account from 2006 through 2011. From 2009 through 2011 CW1 was promoted to the Director of all AT&T sales. CW1 reported to Don Hutton, Vice-President of Sales for Wireless and Chuck Bernstein, Vice-President of Sales for Wireline.

**AT&T Announces Domain Supplier Strategy; Tellabs Executives Informed of Major Loss in Revenue**

63.     CW 1 confirmed that, in mid-2009, AT&T announced it would only purchase certain products from two large "domain suppliers," and that Tellabs would not be one of them.

At that time, AT&T represented 35% of Tellabs' revenue in 2010. CW1 confirmed that the impact of losing AT&T as a customer for several products was substantial.

64. CW 1 had many discussions with Tellabs' Chief Executive Officer ("CEO"), Rob Pullen ("Pullen") regarding the expected loss of AT&T revenue. They discussed specific details of how fast AT&T would be able to implement the product changes in its networks and how soon that would impact the AT&T revenue stream at Tellabs.

65. CW 1 also participated in quarterly sales account reviews with Defendant Wiggins. In 2010, those reviews included CW 1's projections about how fast AT&T could phase out its purchases from Tellabs and how soon it would impact Tellabs' revenue stream.

66. CW 1 stated that Defendant Minichiello was Wiggins "right hand man" and crunched all the company finances. "Any number going in or out, [Wiggins] knew about."

67. CW 1 also issued quarterly sales account reports, which he submitted to his supervisors, which was supposed to end up with Wiggins and was to be released to the public and "The Street." In CW 1's reports from 2010, CW 1 projected that AT&T sales would continue to decline dramatically. "They were going to shrink and go away to near zero," CW 1 said.

**AT&T Asks Tellabs to Partner with Domain Supplier, Tellabs Refuses**

68. After AT&T's announcement in 2009 about domain purchasing, AT&T's Chief Technology Officer John Donovan ("Donovan") made an offer to Tellabs: to partner with AT&T domain supplier Juniper so that AT&T would continue to buy Tellabs 8600 product. CW 1 said that Tellabs refused. Sales to AT&T declined even more in 2010 after Donovan awarded a Tellabs competitor, Alcatel-Lucent, the sales to replace Tellabs' 8600 in the AT&T networks.

CW 1 stated that "[b]y 2011, we couldn't give [AT&T] anything. They wouldn't even take free stuff."

### Tellabs Pulls Funding for 8900 Product, Focuses on Bad Bet WiChorus

69.     CW 1 stated that in 2010, Tellabs was developing a new product, the 8900, which was supposed to be an upgrade from the aging 8800. The product was expected to be a big seller and allow Tellabs to maintain its market share as the industry was moving from 3G technologies to 4G. The 8900 was nearing completion, but after Tellabs acquired WiChorus in December of 2009, funding was pulled from the 8900, and as a result, the 8900 was never developed.

### Tellabs Knows $120 Million in 5500 Revenue in 2010 was Temporary

70.     CW 1 relayed that in 2010, the 5500 was an aging technology. The industry was moving towards 3G and the 5500 supported only 2G. Sales of the 5500 were projected to continue declining as customers upgraded their networks away from 2G technology. Due to an explosion of demand for bandwidth in 2010, however, the 3G networks were overwhelmed and the fallback was 2G. Suddenly and unexpectedly, a new intensive demand was created for the aging 5500.

71.     As a result, AT&T purchased $120 million of Tellabs' aging 5500s in 2010. It was a temporary Band-Aid fix for the networks, but the huge revenue it generated made Tellabs sales in 2010 look exceptionally good. CW 1 projected that sales of the 5500 to AT&T in 2011 would drop back down to $15 million, and documented these projections on CW 1's quarterly reports that were submitted up the corporate ladder all the way to Wiggins.

72.     CW 2 was a quality assurance auditor at Tellabs from 1998 to 2011, and was responsible for contracting workers to install Tellabs products in customers' networks and then

going back to audit the equipment to ensure it met Tellabs' and the customers' standards. CW 2 reported to Don Olsen-manager of quality assurance.

**Installations of 5500 drop off in 2010**

73.     CW 2 stated that in 2010, requests for Tellabs to install the 5500 in customers' networks began to noticeably decline. CW 1 particularly noticed the decline on his AT&T accounts. "We couldn't get AT&T to accept our equipment," CW 2 said.

**Tellabs announces cuts in spending due to declining revenue in early 2010**

74.     In early 2010, as the installations of Tellabs 5500 fell off, the company began to cut back on its quality assurance employees. During this time, Tellabs' top executives announced at companywide quarterly report meetings that sales and installation revenues were dropping and that cost cutting was required.  CW 2 listened in to these meetings, which were led by CEO Rob Pullen and Defendant Wiggins.

75.     CW 3 was a senior sales engineer from April 2004 to September 2011. CW 3's job duties included ensuring that the equipment sold to customers worked to specifications. CW 3 reported to Todd Brinkerhoff, manager of sales engineering, who reported to Chuck Bernstein, VP of Sales.

**Tellabs' 5500 was a declining product, top executives were aware**

76.     CW 3 corroborated CW 1 and CW 2's statements that by 2010, it was well known to Tellabs that the 5500 had already peaked and was in decline. The 5500 could not support the superfast bandwidth speed that customers now demanded, and as a result, sales declined.

**Tellabs attempts to prop up declining sales of 5500**

77.     CW 3 stated that with the sales of the 5500 stagnating and declining, Tellabs attempted to make the product more attractive to customers by selling it with add-ons. The push

to sell the 5500 with the add-ons was announced companywide via emails. But there was no doubt at the company that the 5500's days were numbered because it simply did not provide the more high tech modern services customers wanted.

78.     CW 4 was a channel sales manager for Tellabs from 2004 to December 2010. CW 4 reported to Jeff Barton, Director of Channel Sales.  CW 4 worked with distributors who sold Tellabs products directly to customers. CW 4 corroborated CW 1, 2 and 3's statements that Tellabs' 5500 product was old technology and obsolete. Tellabs knew even before 2009 that all the telecommunication providers would be moving away from this old technology and that they would no longer be buying the products that supported this old technology, like the 5500. Tellabs' sales of its 5500 were declining in 2008 and 2009 due to AT&T and others purchasing less of this product.

**AT&T Switches its Buying Practices, Tellabs Loses Account**

79.     CW 4 confirmed that in 2009, AT&T began to only buy from "domain suppliers," and Tellabs would not be included in AT&T's list of major suppliers.  CW 4 stated that Tellabs lost AT&T sales for the 5500 and the 8600/8800 products due to this change in procurement strategy. The impact was severe on the company.

80.     CW 5 was a senior financial and tax analyst for Tellabs from May 2009 through November 2012.  CW 5 confirmed that Tellabs lost the AT&T Account in 2010.

81.     CW 6 was director of Global Operations, Engineering, at Tellabs from 2005 to 2012 and was responsible for ensuring that all Tellabs products met their requirements before being shipped out to buyers.

82.     CW 6 corroborated that Tellabs' management knew before the last quarter of 2010 that AT&T was going to go with another company for its next generation IP solution, and

that it would be a huge loss in sales to AT&T. CW 6 further confirmed that Tellabs efforts in 2010 to expand its sales and marketing to garner new streams of revenue failed because Tellabs did not have the right mix of products to sell.

83.     CW 7 was manager of a Product Launch Support team at Tellabs from 2005 to July 2011, and reported to Mark Peek, Vice-President of Servicing. CW 7's team was responsible for taking Tellabs non-hardware products through the last stage of development prior to release for general sale. The marketing department would contact existing customers to invite them to participate in testing the new products in order to promote purchases.

84.     CW 7's team would receive the list of the customers wanting to participate and then initiate the testing process. In 2010, CW 7 stated that AT&T participated less than it had done previously, which indicated it would not be buying new products from Tellabs.

**Problems with meeting new product launch schedules**

85.     CW 7 confirmed that on December 1, 2009, Tellabs acquired WiChorus Inc., a supplier of mobile packet core products that was supposed to provide Tellabs with new products to sell. Immediately after acquiring the company, Tellabs began shifting funding and support from Tellabs' R&D to WiChorus R&D. This included shifting resources away from Tellabs' 8800 product, which CW 7 described as the "money-maker." CW 1 corroborated this fact.

86.     CW 7 said that because of the lack of funding, the R&D units failed to meet their schedules, and reports of these issues were made to the Vice-President of Engineering, R&D and general Vice-President of R& D, Brian Gawick.

87.     CW 8 was a senior product manager working in the WiChorus division of Tellabs from December 2009 to May 2012. CW 8 reported to the director of product management, whom reported to the General Manager of Mobile, Rehyan Jahil.

88.     CW 8 confirmed that by 2009, Tellabs existing products were aging and even one of its top sellers, the 8800, was known to have an expiring shelf life as a product.

89.     In 2010, Tellabs began to invest heavily in WiChorus mobile internet product development, and Tellabs was aggressively trying to market and sell unproduced products.

90.     Customers who were expecting the new products instead saw that Tellabs' WiChorus products were not competitive with other products on the market. CW 8's boss and the general manager had meetings with Tellabs executives once a week which CW 8 believed was to discuss progress on the products(or lack thereof).

91.     CW 8 confirmed that Tellabs lost a lot of AT&T business in 2010 when AT&T changed the way it purchased products, including the 8800, a product it previously purchased in great numbers from Tellabs.

**Tellabs Boosts Fourth Quarter 2010 Revenue to Cover Shortfall**

92.     CW 9 was Director of Supply Chain and Global Order Fulfillment at Tellabs from 2004 to December 2011(but had been employed with Tellabs in other capacities since 1988). CW 9 reported to John Brots, Executive Vice President of Supply Chain, and Ed Tymich, Vice-President of Supply Chain. CW 9 was responsible for managing the process between the ordering of products to shipment thereon. CW 9 also participated in a team of directors who prepared Tellabs' quarterly financial forecast reports and the actual earned revenue reports. These reports included information about products that had been ordered and shipped; how much revenue was earned; and revenue recognition issues.

93.     In the last two weeks of every quarter, this team met in a "war room," where the revenue numbers were calculated on sometimes an hourly basis up until midnight of the last day of the quarter. CW 9's team was responsible for calculating revenue, including the determination

of the various revenue recognition rules that applied to product contracts as well as the company's standard accounting practices. Once completed, the team's internal revenue report was given to Tellabs' top executives, including Defendants Wiggins and Minichiello.

94.     According to team's internal calculations, the 2010 Q4 revenue did not meet the $410 million in profit the company previously forecast. CW 9 said that revenue was several million dollars below its forecasted revenue for 2010Q4.

95.     However, CW 9 reported that when Tellabs released its final 2010 Q4 report to the public and Wall Street, Tellabs reported revenue and profits met the forecast, despite the internal calculation to the contrary. CW 9 said that the internal report CW 9's team provided to top executives was about $25 million less than the 2010 Q4 report released to the public.

**Change in Revenue Recognition Rules**

96.     In addition to the inflated revenue that was reported to the public, CW 9 stated that the publicly released Q4 report used a different set of revenue recognition rules that allowed the company to claim revenue in the fourth quarter that under the old rules could only be applied at a future date.

97.     CW 9 said that Wiggins made the decision to apply the new revenue recognition rules after CW 9's team internally reported revenue to him.

98.     With the public release of the 2010 Q4 report, Tellabs announced it had applied the new rules beginning in the fourth quarter but that the company also applied it retroactively to the entire year; however, the impact of the rule change, was almost entirely to boost fourth quarter revenue.

### Forecast of Declining Sales, Tellabs Lackluster Products

99.     CW 9 said the team of directors also prepared quarterly and yearly forecast reports for Tellabs top executives, including Defendants Wiggins and Minichiello.  In 2010 and 2011, these reports forecast a trend of declining sales.

100.     CW 9 also corroborated that the 8800 and 8600 products were targeted to AT&T, but the products never became a big seller.

## Materially False And Misleading Statements Issued During The Class Period

101.     The Class Period begins on June 9, 2010, when analysts reported that the previous evening, Tellabs told Reuters, "We continue to compete for future business at AT&T and other companies…" "The solution we're providing to AT&T has a longer life and a longer runway in the network than the market has given it credit for."

102.     Analysts ate this up, and, as a result, issued positive reports regarding Tellabs. For example, analyst Lawrence Harris of CL King issued a report on June 9, 2010, upgrading his rating, noting that the recent decline in Tellabs stock price was related to concerns over losing AT&T's business, but that Tellabs has allayed its concerns.  Harris stated, "We believe Tellabs would have a good understanding of AT&T's long-term network plans." He further stated "We believe demand for the high margin 5500 digital cross-connect…remains strong."

103.     The very next day, Tellabs issued false statements at a publicly disclosed Analyst conference regarding its loss of the AT&T business.  At the UBS Global Technology and Services Conference on June 10, 2010, analysts specifically asked Defendant Wiggins and CEO Pullens questions with respect to the loss of the AT&T business.  Defendants falsely disclosed that they expected the AT&T business to increase:

    <Q - Nikos Theodosopoulos, Analyst, UBS Securities LLC>: Okay. Are there any questions? Otherwise I can kick it off. Okay Well, I mean I think, Tim, thanks for the

presentation. I think the most topical question right now is around the position in wireless backhaul for the 8600 and 8800 at AT&T. I know it's sensitive to talk about the specific customers, but given the recent stock price reaction to several notes that analysts have written, can you talk about what historically you sold to AT&T in terms of the 86, 8800 and what are the prospects going forward, given potentially some increased competition there?

<A - Timothy J. Wiggins, Executive Vice President and Chief Financial Officer>: Okay, sure. Well, a number of thoughts. **One, I think probably as a set up, our business has been increasing over the last several quarters with AT&T. Based on the data we have in the second quarter, it continues to ramp probably a little bit ahead of where we expected.** Equipment is operating with a five 9s reliability in their network, and I would say our number one priority is to support our customers' current network rollouts, which we believe is going well. And in so doing, we earn the right to compete for future business.

We do have an industry-leading density for multi-service traffic. And as I was trying to show in the chart that where you have lots of copper, you need the multi-service. And so I think from an economic standpoint in the multi-service, we've got a great box, it's got great density and price points. And even through all the research, the good news is that nobody said that there's a problem with the performance of equipment.

**What's new, as I mentioned we're working on new higher-density Ethernet cards for both the 8800 and the 8600. And we have a sizeable footprint that we're able to leverage. So, Nikos, what we're – well, we have a hunting license to support AT&T in their network and Cisco had a hunting license as well. What's new? What's developed is that one of our competitors, ALU, has come to AT&T and made a proposal to offer pure Ethernet in their backhaul. And we believe they've been granted a trial. So we've moved from really two hunting licenses to three.**

**What we're seeing in the current term is no degradation of the orders from the customer, but in fact we're seeing stronger orders than we expect so. And what we're gathering is, is it's certainly the customer would prefer over time to put a pure Ethernet system in because if you think about the cost difference between multi-service and Ethernet, the pure Ethernet is probably a third less expensive.**

**So what we're really seeing here with respect to ALU is a trial for pure Ethernet. Our sense is and what we're seeing also in the research is, that's going to take time. People are talking about sometime in the next year. So that's a little hard for us to tell. But what we're seeing in the near term and what we expect for the balance of the year is continued growth in our data products as a result of this business that we're getting.**

Certainly, AT&T is an important part of our business. We disclosed last year in our K that two customers accounted for about 51% of our business that was Verizon and AT&T, Verizon being 30%?

. . . .

<Q - Nikos Theodosopoulos, Analyst, UBS Securities LLC>: All right. **So maybe if I just sum this up before I move on to another topic, it sounds like there's a new competitor but at this point there hasn't been order cancellations or decreased visibility as a result of this. It's just one more competitor in the market and you'll just have to compete with one more player for the business. But there's been no change in the order patterns is what you were expecting.**

<A - Timothy J. Wiggins, Executive Vice President and Chief Financial Officer>: **Well, I would add with one caveat.** We sell into AT&T two of our products. We sell our 8860 and our 8605. The 8605 is at the cell site. The 8860 is the big aggregation box. The bulk of our revenue, more than 80% of the revenue depending on the quarter is being generated today by the 8800. There is some question that is not clear in my mind about the cell site box, and it really has to do with how many ports for giga-E does it have. So the customer has been evaluating what to do with the cell site. My sense is that that's yet unresolved. **But based on their ordering patterns, even if the customer decides to make some changes at the cell site, that the strength of the orders we're seeing in the core would likely overcome that.** So there has been some talk there. I don't think the customer's fully sorted that out. (emphasis supplied).

104.    Again, analyst Harris of CL King & Assoc. confirmed its prior rating of the stock, issuing yet another positive Tellabs report on June 11, 2010.  He based his report on the Company's statements regarding its sales to AT&T: "Based on Mr. Wiggins comments, we estimate that AT&T accounts for 30% or more of Tellabs' revenues versus 21% in FY09. AT&T is a customer for Tellabs' 8600 and 8800 platforms.  AT&T has been increasing spending on backhaul due to growth in data traffic…" Analyst Harris went on to comment on the Company's disclosures regarding its solutions to AT&T purchasing from its domain vendors: "[b]oth the new Alcatel-Lucent product and the proposed Tellabs WiChorus solution would be available next year."

105.    These statements were false, as CW 1, 7, and 8 all confirmed that WiChorus failed miserably by this point, and was unable to produce any products. In addition, Tellabs refused to cooperate with Juniper and lost its AT&T sales to Alcatel-Lucent, including its 8800 product.

106.　On June 15, 2010, in an article published by Reuters, entitled "Tellabs (Nasdaq: TLAB) denies Lost AT&T Business; Analysts expect Revenue Pressure on Tellabs Next Year," Reuters stated "Tellabs Inc. (Nasdaq: TLAB) said it does not expect to lose business from U.S. communications giant AT&T (NYSE: T) to competitors. The communications manufacturer also said orders remain robust this year. Although competition has clearly increased, Tellabs has experienced "no degradations" between the company and AT&T, said CFO Tim Wiggins, adding that orders have increased more than expected.

107.　On this same day, another analyst by Beacon Equity further relayed that upbeat news that Tellabs did not expect to lose AT&T's business:

> Tellabs (Nasdaq: TLAB) denies Lost AT&T Business; Analysts expect Revenue Pressure on Tellabs Next Year
> Posted by merkadirk on Jun 15, 2010 | No comment
> Tellabs Inc. (Nasdaq: TLAB) said it does not expect to lose business from U.S. communications giant AT&T (NYSE: T) to competitors. The communications manufacturer also said orders remain robust this year.
> Although competition has clearly increased, Tellabs has experienced "no degradations" between the company and AT&T, said CFO Tim Wiggins, adding that orders have increased more than expected.
> Analysts believe AT&T is building out capacity to accommodate a spike in mobile Internet traffic from the Apple iPhone, but the increased demand is expected to slow in 2011 as AT&T moves away from higher-priced router options.
> Increased pressure on Tellabs shares have intensified in recent days on rumors that AT&T may switch from Tellabs' 8600 and 8800 routers to Alcatel-Lucent SA routers for AT&T's recently-introduced Long Term Evolution (LTE) network. Orders from AT&T account for approximately 21% of Tellabs total sales and 40% of its broadband networking equipment sales, said analysts at Morgan Stanley.

108.　On this news, shares rose 2%, and resulted in  CL King & Associates analyst Lawrence Harris upgrading Tellabs to "accumulate" from "neutral," based on his beliefs that the fears of an AT&T defection to rivals is overblown.

109.　On July 20, 2010, in a Tellabs earnings preview published by Seeking Alpha, it reaffirmed the importance of the development of new technology:

The overall trend in recent estimate revision is rather flat for Tellabs Inc. (<u>TLAB</u>). We believe Tellabs' next-generation advanced IP-access (growth) products will continue to receive market traction. Massive demand for high-speed mobile data and video services resulted in rapid growth for wireless backhaul and optical transport products.

However, some analysts have raised doubt about the company's ability to maintain contracts with one of its key customers. Tellabs will declare its second quarter 2010 financial results on July 27, before the opening bell.

Agreement of Analysts

None of 12 analysts covering the stock made any change to their earnings per share (EPS) estimate for the second quarter in the past 30 days.

Seeking Alpha further went on to state:

On the other hand, some industry sources predicted that Tellabs may lose a contract from its most important customer **AT&T** (<u>T</u>). *If the rumor proves true*, the contract loss will have serious consequences on Tellabs' overall financials. Historically, AT&T generated 20%–21% of Tellabs' total revenue and accounted for nearly 40% of the company's sales of the broadband-data networking products.(emphasis supplied).

110.    However, as of this time, Tellabs knew that it had lost its contract with AT&T. When this rumor came to fruition, shares dropped 20%.  Tellabs' statements in ¶¶ 101-109 above were false and misleading for the reasons stated in ¶ 16(a)-(j).

111.    On July 26, analyst Lawrence Harris of CL King & Assoc. issued a report in anticipation of Tellabs announcement of its financial results for the second quarter of 2010.  He stated "We believe Tellabs saw a strong increase in sales to AT&T." He further noted that Tellabs shares, while volatile, have increased 20% since June 8th.  This is the beginning of the Class Period, when Tellabs began denying its loss of AT&T as a customer.

112.    On July 27, 2010, Tellabs disclosed its second quarter for 2010 financial results. On the earnings call it had with analysts, the Company reiterated its high demand from AT&T.

113.    [Pullen:] During the quarter, as some of you saw Tellabs stock dropped and it was based on information about one of our customers, AT&T. And I want to address this issue head

on. While I can't speak for our customer, we do know that AT&T is trialing a third vendor in its mobile back-haul networks. **At the same time, Tellabs sees good demand from AT&T. We're in the network now. We're seeing growth on the embedded base.** And we believe we offer the lowest risk and the least cost evolution to the long-term evolution in the mobile backhaul.

. . . .

\<Q - Simona Jankowski\>: Hi. Thank you so much. Just wanted to ask a question on the AT&T situation and then a second quick one on the business outside North America. But just looking at AT&T, I mean can you just give us a sense for even if we set aside the LTE opportunity, how long do you think just the 3G business you've got there right now could actually keep growing even when they start ramping their LTE backhaul network? And do you think they will be necessarily going to three vendors there or would they still be looking to go with two vendors there for LTE?

\<A - Robert W. Pullen, Chief Executive Officer and President\>: Well first of all, Simona you're going to have to talk to AT&T about specifics in their network. But, **what I can tell you is, is that we're in the network today in the 3G network. Like all customers around the world, I would expect as customers are telling me, they want to get a return on investment on their 2G and 3G assets and that will be in the network a very long time.** Then as for going forward with LTE, you'll have to ask AT&T, but we do know that we are approved today with one other vendor. **And AT&T has certainly introduced a new vendor and we would expect this to be competitive going forward.**

. . . .

\<Q - Rod Hall\>: Yeah, thanks for taking my question. I just have two quick ones. First of all, I wonder if you could comment on AT&T again, whether the third competitor would be end-to-end? So is that – are we talking about 8600 and 8800 impacts or is one or the other potentially more impacted from a share point of view if that vendor does get approved eventually?

. . . .

\<A - Robert W. Pullen, Chief Executive Officer and President\>: Sure. I'll take that, Rod. **First of all, the approved products at AT&T are the 8800 and 8600 and I didn't give a quantitative answer before but I'll circle back. We have a majority of market share at AT&T in this mobile backhaul.** As for end-to-end, Rod, you're going to have to talk to AT&T about that. I do expect to continue participating in AT&T's network and as I said earlier, I do expect this new competitor to come in and challenge us for some share. But I can assure you that we're going to compete and justify our business. As I mentioned earlier, we believe that we're offering the lowest risk evolution in migration to LTE and we believe it's a least cost as well. We're also working on next generation products.

. . . .

<Q - Simon Leopold>: Okay that's helpful, that helps me figure out how to understand that. And then two more, one was – and Rob thanks for taking this AT&T issue head on. I'd like to kind of look backwards on this a little bit and see if you can tell us was there any substance to all of the concern we had in terms of what's going on near term, ignoring kind of the opportunity or possibility of competitors later. What's kind of been the tone, temperament of what happened either during the quarter or more recently?

<A - Robert W. Pullen, Chief Executive Officer and President>: Well, if I understood your question correctly, Simon, **I believe the market overreacted to the rumors and that's why we wanted to address this head on. We continue to perform well in the account.** As I said, we're offering both an evolution to the embedded base of equipment as well as a next generation system. And the stock is, from what I could tell over the past few days, moving in the proper direction for fair valuation of Tellabs.

<Q - Simon Leopold>: **But was there any substance to just the idea that there was some modest share shifting for backhaul during the quarter?**

<A - Robert W. Pullen, Chief Executive Officer and President>: **If there was any, Simon, it was very modest, very modest.**

. . . .

<Q - Todd Koffman>: Thank you very much and Rob again, thanks for the clarity regarding AT&T. **One last question on that, as it relates to the timing of the situation and business opportunity for LTE backhaul at AT&T. When do you think you'd have clarity as to how this ought to – vendor share and position agreements would shake out? It would seem like we're getting fairly late into the choice cycle and so I would think – you tell me, when is the timing when you'd have a lot of clarity on your business opportunity there?**

<A - Robert W. Pullen, Chief Executive Officer and President>: **I don't think there will be a perfect time for clarity, Todd.** We're going to continue to battle this out day by day in the field and right now, customers, including AT&T, are spending a fair amount of money both in their 3G and transitioning to LTE[.]

114.     Analysts were very upbeat on this news.  Analyst Lawrence Harris of CL King issued a report on this same day, upgrading its rating from Accumulate to Strong Buy, and increased its 12 month target price from $9 to $10. The analyst's upgrade was based not only on Tellabs guidance calls for third quarter revenues, but also on its belief that AT&T sales were strong: "We believe AT&T is a major customer for the high-margin 8600/8800."

115.     On August 10, 2010, the Company filed its Quarterly report with the SEC for the 2nd quarter of 2010 ("2Q2010"), signed by Defendant Minichiello and certified pursuant to

Sarbanes-Oxley by Defendant Wiggins, substantially the same certification as in ¶123-125, *infra*.

The 2Q2010 reaffirmed Tellabs financial results previously announced on July 27, 2010.

116.    Then, on August 12, 2010, Tellabs participated in a public technology conference

with analyst Morgan Keegan.  Again, Tellabs reiterated AT&T's importance.

> [Pullen:] Sure, well, first of all, and maybe most important, I can't speak for AT&T. You folks need to talk of them. But having said all that, what I will share with you is they are a very good customer. **Our orders still remain very good and we are approved in their mobile backhaul and obviously, it's growing demand there.**
> **As I shared on the earnings call, we do know that they are about to introduce a new vendor into the mix, but we continue to be deployed in their current business and it's a big and growing marketplace. We will continue to do well there.**

. . . .

> [Q] Simon Leopold, Analyst, Morgan Keegan

> And one of the other things, I think we touched on this in the conference call, and since then, the topic of partnerships has come up, as it relates to Tellabs. **I know that, having talked to AT&T, one of the things they have incurred from their vendors is if you are not necessarily a primary vendor, you partner with somebody who is and that could be a conduit for sales.**

> I suspect that that's part of what's working in your favor here, but maybe where you can't get into specifics, could you at least share your thoughts and your history of working with partners as a sales channel?

> [A] Robert W. Pullen, Chief Executive Officer and President

> Sure. First of all, Tellabs works with a lot of different partners, both local partners that do some value-add for us with sales, relationships, and value-add services. There is many, many of those. We also work with big systems integrators, both Nokia Siemens Networks and Ericsson, to name two, where we collaborate with them. In fact, Nokia Siemens Networks and Tellabs partnered to go into the MegaFon business in Russia. And with Ericsson, we've worked with them for over 20 years as well where we are constantly working on new opportunities to augment one another.

117.    Further, in that technology conference, Tellabs affirmatively stated that it had a

relationship with Juniper, AT&T's domain supplier:

> **Also recently I was speaking with Kevin Johnson at Juniper and we have our products interoperating around the world for customers as well. And so our equipment's in their lab, we're doing interoperability testing with them for customers around the world, including AT&T.** (emphasis supplied).

118. This statement was clearly false and misleading, as CW 1 relayed that Tellabs refused to enter into a business relationship with Juniper, despite AT&T's Chief Technology Officer's suggestion in order to keep AT&T's business.

119. The market and analysts were left in the dark regarding Tellabs' aging technology and its termination with AT&T as a customer. Indeed, on this same day, analyst Lawrence Harris of CL King issued a report entitled, "Tellabs Tone Upbeat, Repeats Q3 Guidance, Confirms Relationship with Juniper." The analyst reaffirmed Tellabs as a "Strong Buy," based on the Company's guidance and "confirm[ation] that Tellabs is working with Juniper. He has been talking with Kevin Johnson, the CEO of Juniper. Tellabs' equipment is currently in Juniper labs. The two companies are working on interoperability testing for customers, including AT&T." Analyst Harris also noted that the Company "emphasized that it is continuing to ship mobile backhaul equipment to AT&T."

120. These statements were false and misleading pursuant to the reasons set forth in ¶16(a)-(j), as well as the statements made by Confidential Witnesses. CW 1 stated that Tellabs refused to work with Juniper and decided to continue solely on its own, with AT&T then refusing to purchase products from the Company.

121. On October 26, 2010, the Company issued a press release entitled "Tellabs earnings per share double as revenue rises 10% year-over-year." Therein, the Company, in relevant part, stated:

> International revenue increases 14% year-over-year
>
> Naperville, Ill. - Tellabs' third-quarter 2010 revenue totaled $429 million, up 10% from $389 million in the third quarter of 2009. International revenue was $132 million, up 14% from a year ago.

On a GAAP basis, Tellabs earned 15 cents per share in the third quarter of 2010, up from 7 cents per share in the year-ago quarter. Third-quarter 2010 GAAP net earnings were $57 million, compared with $29 million in the year-ago quarter.

On a non-GAAP basis, Tellabs earned 16 cents per basic share and 15 cents per diluted share in the third quarter of 2010, compared with 7 cents per share in the year-ago quarter. Non-GAAP net earnings were $59 million in the third quarter of 2010, compared with $28 million in the third quarter of 2009. N on-GAAP results for the third quarter of 2010 exclude pretax charges of $13.5 million, including $7.4 million or 1.3 cents per share in equity-based compensation expense

Tellabs' GAAP gross profit margin was 50.2% in the third quarter of 2010, compared with 41.7% in the year-ago quarter. Tellabs generated $74.3 million in cash from operations during the quarter.

"Tellabs is generating profitable revenue by enabling customers to power the smart mobile Internet," said Rob Pullen, Tellabs president and chief executive officer. "It's early in the game for mobile Internet, and user demand for smartphones, tablets and mobile data is very strong."

For the third quarter of 20 1 0, Broadband segment revenue was $199 million, down 3% from the year-ago quarter. Transport segment revenue was $170 million, up 33%. Services segment revenue was $60 million, up 9%.

**Share Repurchase** - Under previously announced share repurchase plans, during the third quarter of 2010 Tellabs repurchased approximately 15.6 million shares at a cost of $111 million. Over the past 5 years, Tellabs has repurchased more than 25% of its shares outstanding. Approximately $275 million currently remains under a previously authorized share repurchase program. Tellabs plans to continue returning capital to stockholders through dividends and share repurchases.

**Fourth-Quarter 2010 Guidance** - The following statements are forward-looking statements that are based on current expectations and involve risks and uncertainties, some of which are set forth below.
**Tellabs expects fourth-quarter revenue to be in the range of $410 million to $430 million, up from $389 million in the fourth quarter of 2009. Tellabs expects fourth quarter gross margin to be 44%, plus or minus 1 or 2 points, depending on product mix. Tellabs expects fourth-quarter 2010 non-GAAP operating expenses to be in the mid-to-high $140 millions. Tellabs' expected fourth-quarter non-GAAP operating expenses exclude approximately $6 million in equity-based compensation expense. The fourth-quarter non-GAAP tax rate will be about 32%.**

122.    On the same day, the Company held a public conference call with investors, analysts and other market participants regarding its Q3 2010 financial results.  Robert W. Pullen ("Pullen"), the Company's former president and CEO, and Defendant Wiggins were present. Therein, Pullen and Defendant Wiggins, in relevant part, reiterated the Company's Q4 2010 guidance:

> *[Pullen:]* Now let's turn to the fourth quarter. As we've said earlier, international revenue is expected to increase in fourth quarter; North American revenue is forecast to be down. **So in the fourth quarter, we expect revenue to be in the range of probably 410 to 430 million, which is up from 389 million in the fourth quarter of 2009.**
>
> We expect fourth quarter gross margin to be 44%, plus or minus one or two points.  It'll depend on product mix, but it's dominantly as a result of anticipated lower cross-connect sales.
>
> We expect fourth quarter 2010 non-GAAP operating expenses to be in the mid to high $140 million as a result of higher R&D spending, dominantly in our growth products. This excludes approximately 6 million in equity-based compensation. And the fourth quarter non-GAAP tax rate's going to be around 32%.
>
> *       *       *
>
> *[Defendant Wiggins:]* **Turning to our outlook for the final quarter this year, based on orders in 3Q, backlog and given the overall market conditions, we are guiding for fourth quarter revenue to be in a range between 410 million and 430 million. On a year-over-year basis, that equates to between 5 and 10% revenue growth.**
>
> We expect gross margin in the fourth quarter to be 44% plus or minus a point or two.  A lower level of revenue from digital cross-connect systems drives most of this anticipated change. A mix shift within data products and higher revenue from ONTs also contributes to the lower overall gross margin guidance.
>
> We expect non-GAAP OpEx for the fourth quarter to be up in dollars and land in the mid- to high $140 million range as we continue to spend on R&D, particularly for growth products in combination with the anticipated spend on parts and prototypes.   In addition, we expect the effect of expensing equity-based compensation in the fourth quarter will be about $6 million, split between operating expenses and cost of goods sold.

123.    On November 9, 2010, Tellabs filed its Quarterly Report with the SEC on Form 10-Q for Q3 2010. The Company's Form 10-Q was signed by Defendant Minichiello, and contained Sarbanes-Oxley certification signed by Defendant Wiggins, substantially the same as in ¶¶ 123-125, *infra*. The Quarterly report reaffirmed the Company's financial results previously announced on October 26, 2010. Therein, the section entitled "Management's Discussion and Analysis of Results of Operations and Financial Condition," in relevant part, stated:

**Critical Accounting Policies**

There were no material changes in our critical accounting policies during the quarter.

**Outlook**

**We expect fourth-quarter revenue to be in the range of $410 million to $430million, up from $389 million in the fourth quarter of 2009. We expect fourth quarter gross margin to be 44%, plus or minus 1 or 2 points, depending on product mix. We expect fourth-quarter 2010 non-GAAP operating expenses to be in the mid-to-high $140 millions. The expected fourth-quarter non-GAAP operating expenses exclude approximately $6 million in equity-based compensation expense. The fourth-quarter non-GAAP tax rate will be about 32%.**

124.    The statements contained in ¶¶ 101-123 above were materially false and/or misleading when made for the reasons stated in ¶ 16(a)-(j), and the statements made by the Confidential Witnesses. As a result of the above, the Defendants' positive statements and outlook for Q4 2010 lacked a reasonable basis and/or were materially false and/or misleading when made.

125.    The house of cards began to crumble when the Company made a partial disclosure regarding its loss of the AT&T business. On January 25, 2011, Tellabs issued a press release entitled "Tellabs fourth-quarter revenue rises 5% to $410 million." The Company reported that it had hit the low end of its previously issued Q4 2010 revenue guidance and

provided guidance for Q1 2011 that reflected a substantial further revenue slowdown. Therein, the Company, in relevant part, stated:

Company posts fourth-quarter GAAP net loss of $11 million or 3 cents per share

Naperville, Ill. **- Tellabs' fourth-quarter 2010 revenue totaled $410 million, up 5% from $389 million in the fourth quarter of 2009.**

On a GAAP basis, Tellabs recorded a net loss of $11 million or 3 cents per share in the fourth quarter of 2010, compared with net earnings of $62 million or 16 cents per share in the fourth quarter of 2009. The fourth-quarter 2010 net loss included a pretax charge of $16.5 million for excess purchase commitments related to a cancelled tender in India.

On a non-GAAP basis, Tellabs earned 2 cents per share in the fourth quarter of 2010, compared with 9 cents in the year-ago quarter. Non-GAAP net earnings were $6 million in the fourth quarter of 2010, compared with $36 million in the year-ago quarter. Non-GAAP results exclude $6.3 million or 1.2 cents per share in equity based compensation expense.

**2010 Annual Results** - Tellabs 2010 revenue was $1.64 billion, up 8% from $1.53 billion in 2009. On a GAAP basis, in 2010 Tellabs earned $156 million or 41 cents per share, up from $114 million or 29 cents per share in 2009. Tellabs' 2010 non GAAP net earnings were $176 million and 46 cents per share, compared with $119 million or 30 cents per share in 2009.

Tellabs' GAAP gross profit margin was 38.0% in the fourth quarter of 2010 (42.0% excluding the charge for excess purchase commitments), compared with 45.3% in the fourth quarter of 2009. Tellabs generated $53.1 million in cash from operations during the quarter.

"Tellabs' fourth quarter brought revenue growth but a setback in profitability," said Rob Pullen, Tellabs president and chief executive officer. "Looking ahead, customers continue to validate Tellabs' focus on the smart mobile Internet, and we remain focused on investing our way forward to pursue this growth opportunity."

For the fourth quarter of 2010, Broadband segment revenue was $227 million, Transport segment revenue was $123 million and Services segment revenue was $60 million. For 2010, Broadband segment revenue was $846 million, Transport segment revenue was $554 million and Services segment revenue was $242 million.

**Share Repurchase** - Under previously announced share repurchase plans, during the fourth quarter of 2010 Tellabs repurchased 7.6 million shares at a cost of

$50.9 million. For the full year 2010 Tellabs repurchased 25.1 million shares at a cost of $178.8 million.

**Adoption of new accounting pronouncements** - In the fourth quarter, Tellabs early-adopted two required accounting standards related to revenue recognition, Accounting Standards Update ("ASU") No. 2009-13 and ASU No. 2009-14 for transactions originating or materially modified in 2010. These new standards generally result in earlier revenue recognition than under previous standards for certain deliverables in multiple-element arrangements. Tellabs adopted the new standards effective as of the beginning of 2010; therefore, the previously reported quarterly results have been revised to reflect the impact of adoption. The adoption increased Tellabs fourth-quarter 2010 revenue by $8.8 million and annual revenue by $9.1 million.

First-Quarter 2011 Guidance - The following statements are forward-looking statements that are based on current expectations and involve risks and uncertainties, some of which are set forth below. *We expect first-quarter 2011 revenue to be in a range from* **$315** *million to* **$335** *million.* We expect non-GAAP gross margin to be 40%, plus or minus two points, depending on product mix. We expect first-quarter non-GAAP operating expense to be down slightly, in the high $140 millions. Tellabs' first-quarter non-GAAP gross margin excludes approximately $1 million, and non-GAAP operating expense excludes approximately $6 million, in equity based compensation expense. We expect a first-quarter non-GAAP tax rate of about 32%.

Tellabs believes that the presentation of non-GAAP financial information provides important supplemental information to management and investors regarding financial and business trends relating to the company's financial results. More detailed information, including year-over-year segment comparisons, non-GAAP reconciliation tables and the reasons management believes non-GAAP measures provide useful information to investors can be found in the Results of Operations section of this news release.

126.    On the same day, the Company held a public conference call with investors, analysts and other market participants, regarding its Q4 2010 and year-end financial results. Pullen and Defendant Wiggins were present. Therein, Pullen, in relevant part, admitted that the reported Q4 2010 revenue had actually benefitted from the manner in which it sold products to a customer:

[Pullen:] We early adopted two required revenue recognition rules to better reflect the economics of our multi-year deals that we had already entered into. And that increased our revenue about $9 million.

**Our fourth quarter revenue also reflected our agreement with a North American customer to add our data product to other products already sold to this customer through a distributor. This change increased our revenue by about $21 million.**

127.     During the Q4 2010 conference call, Defendant Wiggins further commented on the change in the distribution arrangement with one of the Company's customers and specifically explained that this change had resulted in Tellabs recognizing $20.8 million in revenue in Q4 2010 that otherwise would have been recognized in Q1 2011:

> *[Defendant Wiggins:]* Good morning, everyone. To begin, I'll give a little more background on some of the items affecting this quarter's results. We had two items that positively affected our results in the fourth quarter and one with a negative effect. All these are described in the MD&A section of this morning's press release.  But let me tell you about them now.

> First, during the quarter, we adopted … the new revenue recognition standards for multi-deliverable contracts, and contracts with software elements. Although we had planned to adopt these standards in the first quarter of 2011, we did it last year because we were entering into several large multi-year contracts, and we believe the new rules would best reflect the economics of those deals over time.

> As a result, revenue and net earnings in the fourth quarter of 2010 increased by 8.8 million and 0.5 million, respectively. For the year 2010, revenue and net earnings increased by 9.1 million and 0.5 million, respectively. We adopted these standards as of the beginning of 2010, and our previously reported quarterly results have been revised to reflect the impact of the adoption.

> ***Second, revenue in the quarter also reflected our agreement with a North American customer to add a data product to other Tellabs' products already sold to that customer through a distributor. This way of doing business helps the customer better manage inventory and deployment schedules. As a result, we recognized $20.8 million in revenue in the fourth quarter of 201 0 that otherwise would have been recognized in the first quarter of 2011.***

> And now for the third item, during the quarter we took a pre-tax charge of $16.5 million, that's $12.2 million net of tax, for excess purchase commitments related to a number of Tellabs-specific components we ordered last year for a large project in India. The tender was canceled in January, and we are writing down the parts we estimate to be in excess of our needs.

128.    During the Q4 2010 conference call, Defendant Wiggins specifically admitted that the fact that Tellabs was changing its distribution arrangement with this customer - which resulted in an out of the ordinary $20.8 million beneficial increase to Q4 2010 revenue that otherwise would have been recognized in Q1 2011 - had been known at the time Defendants provided the Q4 2010 guidance in October 2010 and was factored into the Q4 2010 guidance:

> [Analyst:] Okay. So I guess when I look at the first-quarter guidance, you had – even though the business was up a little bit here, the - that $20 million revenue recognition looked like it should have been in the first quarter of next year. So is that the big delta that we're looking at in that first quarter guide in addition to cross-connects being soft? Is that the perspective on that?

> And can you provide a little bit more insight as to what surprised you here in terms of what this customer decided to do?

> [Defendant Wiggins:] One, we did not anticipate - **I'm sorry, when we set the guidance and provided it to you in October, we did anticipate the change in this distribution arrangement with the customer.** We did not anticipate, as we mentioned, changing the revenue recognition standards, but we did have a couple of very large contracts that we wanted to sign in 4Q, and we felt that the accounting under the new rules better reflected the economics.

…

> [Analyst:] Thanks. Just to clarify for me, you talked about this $21 million in revenues; it sounds like the recognition was pulled forward. But then the press release notes a $9 million difference in the quarter. What's the total impact from accounting change [and] other that impacted 4Q revenue positively?

> [Defendant Wiggins:] Okay. Well, there are a couple of items, Michael. One is that we adopted the new revenue recognition standards, which we did not contemplate when we gave you guidance. That was $8.8 million, or call it $9 million, in 4Q. It had very little impact in periods one, two and three. As you can see, the difference between the $8.8 million and the $9.1 million. So, revenue recognition was the first thing.

> **The second thing was we had a change in how we sell to a customer in North America for a product. It's now included with other products that had been previously sold through the distributor. The net result was that those orders for us occurred in 4Q, otherwise would have been in Q1. That was about $21 million. The sum of the two together at about $30 million.**

**[Pullen:] And ... as for the distributor, we had contemplated that when we gave you guidance, Michael.**

**And as Tim mentioned, we had already been doing business with this distributor to the end customer. And the distributor helps the end customer both manage inventory, deployment schedules, and gives them content and minority women business enterprise and disabled veterans enterprise, which curries favor for government contracts. So, we had already been doing business with this distributor before today.**

129.    Additionally, during the Q4 2010 conference call, Defendant Wiggins effectively admitted that when evaluating the Company's Q4 2010 financial results, Tellabs' reported revenues would have been substantially below the previously issued guidance if adjusted to remove the unusual $20.8 million benefit from the acceleration of revenue recognition to Q4 2010 as a result of the change in the distribution arrangement with the customer:

[Analyst:] ... First of all, if we were to take the $30 million of accounting changes in Q4, and put them back into Q1, then this quarter would have been $380 million instead of $410 million, and the walk down into Q1, I assume would that be $30 million higher. So taking the midpoint, maybe you would be on $355 million.

So it looks like your normal seasonality into Q 1 from this lower Q4 sort of makes sense when viewed in the old accounting construct. I want to make sure that's correct.

And then - but then we have the issue of doing a $380 million when you had been guiding to -let's take the midpoint of your guidance of $420 million. Tim, can you just walk us down? Was that all 5500 related the $40 million missing between the $420 million you had sort of expected, and the $380 million under the prior accounting?

[Defendant Wiggins:] ... **[I]nteresting math, but let me touch on a couple things. One is, as Rob pointed out, the change in this distribution agreement was something we contemplated when we gave the guidance, albeit, you know, we came in at the low end of the $410 million range.** The revenue recognition standards was something we did not anticipate.
…
So, certainly it's right. I think your analysis is directionally correct on moving the distribution agreement revenue from 4Q to 1Q. **I think the revenue recognition is probably not the right way to think about it. So, hopefully, that's a little bit helpful. . . .**

130.    Further, during the Conference call, the Company for the first time admitted that AT&T was the cause of decreased revenues and forecasts.

**Robert Pullen** - Chief Executive Officer, President and Director

...

Fourth quarter, in the revenue, was within our guidance range. But we wanted to share with you also some modifications we've had. We have early adopted two required revenue recognition rules to better reflect the economics of our multi-year deals that we've already entered into. And that increased our revenue about $9 million. Our fourth quarter revenue also reflected our agreement with the North American customers to add our data products to other products already sold to this customer through distributor. This change decreased our revenue by about $21 million. Fourth quarter international revenue was 41% of our overall revenue. That was up from 31% in the third quarter. This is a positive trend as we diversify our global customer base.

…

Looking to our guidance for the third quarter, we expect revenue to be in the range of $315 million to $335 million. We expect non-GAAP gross margin to be 40%, plus or minus two points, again depending on product mix.

We expect non-GAAP operating expenses to be slightly down and probably in the high 140s. Obviously, we're disappointed in our fourth quarter results and our guidance for the first quarter. After three quarters of strong performance in 2010, we certainly didn't want to end the year this way.

During the first three quarters of last year, our revenue and profits were driven by growth in Digital Cross-Connect and our data products, dominantly for Mobile Backhaul and primarily in North America. In the fourth quarter, our Digital Cross-Connect and data revenue in North America declined. As a result, our revenue declined sequentially in fourth quarter and will decline again in the first quarter. That's the outlook as we see it today, and we'll certainly work hard to improve it.

Despite lower revenue in North America, our fourth quarter data revenue grew, both sequentially and on a year-over-year basis. We won 21 new customers for our data products and generated higher revenue from our SmartCore platform. It was all positive signs in the fourth quarter. The increase investment we've made in sales and services resources outside of North America since 2008 is delivering new customers. Last year in 2010, we won 87 new customers for our growth products.

Customers continued to embrace Tellabs growth products during the fourth quarter. The Tellabs 8600 and 8800 systems gained 15 new customers during the fourth quarter, two in North America and 13 in international markets. The Tellabs 9100 SmartCore platform gained six new customers in the fourth quarter, two in North America and four in international markets. The Tellabs 7100 Optical Transport System gained four new international customers during the fourth quarter.

But today, given the level of competition in the international markets, some of this new business comes at initially lower margins than certainly our more established business, and you can see that in our fourth quarter results and our first quarter guidance.

Now turning to Tellabs' annual results. We achieved our goal of profitable growth in 2010. 2010 revenue was $1.642 billion, up 8% from 2009. Revenue rose in all of our segments, the Transport, Broadband and Services.

…

We believe we are positioned with the right customers, resources and solutions to make this transition. Over the past three years, we've made significant progress on Tellabs goal of profitable growth. And as most of you know, we had a transition from two and half to three years ago.

Our non-GAAP gross margin rose from 35.5% in 2007, to 48.3% in 2010. Non-GAAP net earnings increased 69% from $104 million in 2007, to $176 million in 2010. Non-GAAP net earnings per share grew from $0.24 in 2007, to $0.46 in 2010. Our growth products revenue increased from 25% of overall revenue in 2007, to 56% in 2010. And we continue to return capital to our shareholders through both share repurchases and dividends.

…

In December of 2009, we acquired the SmartCore 9100 platform. Since then, we focused the company on evolving from Mobile Backhaul to advancing to smart mobile Internet. So where's Tellabs today? We are managing a core business in secular decline. That's also as we nurture the growth of new and more global business. A key challenge since I took this job has been to replace our core product revenue with new growth product revenue and diversify our customers. We're making progress here. With our solid balance sheet, we have resources that we need to manage successfully through this transition, but we will manage through the transition. We could be solidly profitable today if we have reduced our investment in growth technology and growth markets, but that's not the right thing to do for the long term. I believe that creating shareholder value is all about building a bright future for the business. Sometimes it takes longer than we like. But I'm confident we're in the right path. We will stick with our strategy to invest

in key technologies and markets. We'll also exercise continued discipline to drive down our expenses in other areas of the business. We'll do what's right for our shareholders, our people and our customers. And that's what we believe in.

Looking ahead, we feel that mobile Internet presents new challenges to our customers and challenges that Tellabs is uniquely positioned to solve. Let me tell you about this once-in-a-generation opportunity we're pursuing. The age of the smart mobile Internet is only beginning. In our addressable markets, we see compound annual growth rates that are about in the mid-teens of growth. Let me highlight four points to you. First, the mobile Internet represents one of the biggest growth opportunities in telecom history. Starting with a half a billion wireless devices today that are connected to the Internet, we see a 20-fold increase to more than 10 billion wireless devices over the next decade, that's both people to people and machine to machine.

Second, mobile data traffic is growing explosively. Over the last three years, our customers mobile data traffic has grown 10 to 40x. Over the next few years, we see 40x growth in that mobile data. Third, this opportunity is still in its very early stages. There's less than 10% smartphone penetration worldwide. And each smartphone generate six to 10x more data traffic than a regular mobile phone. The application flood gate is opening wide, causing further increases in mobile data. And over the top video is another major catalyst for mobile data traffic growth. Four, right now, we're into a new technology cycle and it's starting with Long Term Evolution. To meet these demands, it will take more than adding capacity. It will take adding intelligence networks to make them aware of both applications and users. We've been investing and will continue to invest to advance the smart mobile Internet.

In 2011, we plan to increase Tellabs research and development investment in our growth products, just as we did in 2010. We will evolve our current platforms and launch new platforms. We'll evolve our current platforms with higher density, higher speed and lower cost Ethernet. We'll launch new optical networking platforms such as our Optical Transport node. We'll offer next-generation Mobile Backhaul platforms both for access and aggregation. And we'll deliver on our promise of a combined WiMAX, 3G and Long Term Evolution packet core. All this will be managed by our 8,000 intelligent network managers.

We're building and are growing global business with more than 160 Mobile Backhaul customers. We have now 18 Mobile Packet Core customers and more than 175 Optical customers. Throughout this year, we're going to introduce new solutions, such as Smart Backhaul to improve the quality of service and the quality of user experiences. We're going to deliver the content-aware packet core to deliver personalized services and smart analytics to help our customers optimize and enable monetization of this content. Based on positive feedback from our customers, we're confident that our solutions address customers' needs, to help them succeed in this growing mobile Internet era. With this, I'll pass it

over to Tim for a little bit more detail for financial discussion and then we'll answer any questions you have'

**Timothy Wiggins** - Chief Financial Officer and Executive Vice President

…

Let's take a look at the fourth quarter numbers. After that, I'll review our guidance for the first quarter of 2011. Total revenue for the fourth quarter of 2010 was $410 million compared with $430 million in the prior quarter and at the low end of the guidance range we gave you in October. On a year-over-year basis, total revenue for the quarter was up 5% compared with the fourth quarter of last year.

On a sequential basis, Broadband segment revenue grew, the Service segment was essentially flat and Transport segment revenue declined. Looking at the Broadband segment, we saw sequential growth in all three product categories, data, access and managed access. Within Transport, the vast majority of the decline came from lower Digital Cross-Connect revenue. Optical transport revenue was down slightly compared with the prior quarter.

GAAP net loss for the quarter, driven primarily by a sequentially lower revenue and gross margin and higher operating expenses was $11 million or $0.03 a share. On a non-GAAP basis, net earnings for the fourth quarter of 2010, excluding charges for special items, were $6 million or $0.02 a share.

If you take $6 million in non-GAAP net earnings and subtract $4.3 million or $1.2 a share for equity base comp, by the way that's net of tax, to be consistent with the way first call Reuters compiles and reports the estimates for Tellabs, the result rounds to break-even non-GAAP EPS for the fourth quarter.

On a portfolio basis, revenue from our growth portfolio accounted for 56% of total revenue in the fourth quarter, up from 52% in the prior quarter. On a geographic basis, revenue from customers outside North America grew to account for 41% of total revenue in the fourth quarter, up from 31% in the prior quarter.

Let's take a look at segment data for the fourth quarter. Broadband segment revenue for the fourth quarter of 2010 was $227 million, up 14% from $199 million in the prior quarter. Revenue from the data product category grew to $120 million in the fourth quarter of 2010, up 8% from $111 million in the prior quarter. Growth came from international customers in the EMEA region and higher revenue from our SmartCore platform.

Looking at the full-year of 2010, data continues to be our fastest growing product category. Data revenue grew 52% to $520 million in 2010, compared with 2009. Access revenue grew to $70 million in the fourth quarter, up 20% from $58

million in the prior quarter, sequential growth in this product category was driven largely by an anticipated increase in single-family ONTs.

Turning to Managed Access, revenue in the fourth quarter of 2010 grew to $37 million, up 24% from the prior quarter. We saw increased revenue from both our Tellabs 8100 Managed Access System and the Tellabs 6300 Managed Transport System. Taking all that into account, Broadband segment profits for the fourth quarter of 2010 was $34 million compared with $49 million in the prior quarter, reflecting the $16.5 million charge for excess purchase commitments.

Transport segment revenue was $123 million in the fourth quarter of 2010, compared with $170 million in the prior quarter, driven primarily by an anticipated drop in Digital Cross-Connect system revenue and a small drop in optical transport revenue. Transport segment profit was $24 million in the fourth quarter compared with $71 million in the prior quarter, driven primarily by the lower level of Digital Cross-Connect and Optical Transport System revenue.

Service segment revenue was $60 million in the fourth quarter, consistent with the third quarter. Services segment profit was $18 million compared with $22 million in the third quarter of 2010, driven by a mix of lower margin service revenue in the quarter. On a gross margin basis, non-GAAP gross margin for the fourth quarter of 2010 was 38.2% compared with 50.5% in the prior quarter. Excluding the impact of the $16.5 million charge for excess purchase commitments, gross margin for the quarter would have been 42.2%. Gross margin is dependent on product and customer mix. The shift this quarter is attributable primarily to a number of moving pieces. When you compare the 38.2% with the 50.5% margin, these changes look as follows: about 6.5 points of the decline is related to the lower level of transport revenue, primarily Digital Cross-Connect systems, about four points is related to the purchase commitment charge I described a moment ago. About two points is related to higher international data revenue and lower services margin.

…

Turning to our outlook for the first quarter of this year, based on orders and 4Q backlog and given the overall market conditions, we're guiding for the first quarter revenue to be in the range between $315 million and $335 million. We expect gross margin on the lower level of first quarter revenue to be about 40%, plus or minus two points based on mix. We expect non-GAAP OpEx for the first quarter to be down slightly in the high $140 million range. In addition, we expect the effect of expensing equity base compensation in the first quarter will be about $7 million, split between operating expenses and cost of goods sold.

Your next question comes from the line of Mark Sue with RBC Capital Markets.

**Joseph Longobardi**

This is Joe Longobardi on for Mark Sue. Can you guys give us additional color as it relates to overall customer concentration? Your two largest customers, AT&T and Verizon, still account for greater than 50% of revenue? And just on the international front, are you seeing concentrations develop there? Or is the revenue base a bit more dispersed?

**Timothy Wiggins** - Chief Financial Officer and Executive Vice President

It's Tim. Let me just touch on customer concentration. In 2009, we had two customers that represent 51% of our business and we disclosed that was Verizon at about 30% and AT&T at about 21%. For 2010, those two customers, the concentration increased slightly to 53%. But they flipped positions, AT&T is 35% of our business in 2010, and Verizon is 18%. But I would note in 4Q that the customer concentration was down significantly to around 41%. In terms of the international, we do have some larger customers, where we -- relative to the other ones, we have many more customers internationally. A few of them represent a larger component. But nothing near the concentration that we see here in North America.

**Joseph Longobardi**

And are there any specific points that we could look at in order to give investors comfort in your overall position at AT&T?

**Robert Pullen** - Chief Executive Officer, President and Director

We'll we have shared with you last quarter that they introduced a new vendor in the Mobile Backhaul, that market share transition is happening. We are also participating in the LTE deployment. And that whole transition is reflected in our guidance both in the fourth quarter actual and the first quarter.

**Ehud Gelblum** - Morgan Stanley

And looking at your AT&T and Verizon mix down to 41%, I think you said in the fourth quarter. Was that primarily due to AT&T? You had hinted that they would be weaker in terms of their growth when you went into fourth quarter?

**Robert Pullen** - Chief Executive Officer, President and Director
**Yes, it was primarily due to AT&T**, Ehud.

**Ehud Gelblum** - Morgan Stanley
And would you expect them -- they basically shut down a lot of their spending to get to the end of the year, would you expect that to come back? I would think that, that would just be a budgeting issue and when we get past budgets in February, we might be back to the regular run rate, or do you think there's some sort of more permanent change?

**Robert Pullen** - Chief Executive Officer, President and Director

Well, we hope so. But we're just going through the budget cycle with them right now. And so we don't have great visibility yet.

131.    On this news, shares of Tellabs declined $1.35 per share, or almost 20%, to close on January 25, 2011, at $5.69 per share, on unusually heavy volume.

132.    On February 28, 2011, Tellabs filed its Annual Report with the SEC on Form 10-K for the 2010 fiscal year, signed by Defendants Wiggins and Minichiello, and reaffirmed the Company's financial results announced January 25, 2011.   The 2010 Annual Report also contained Sarbanes-Oxley required certifications, signed by Defendant Wiggins, who certified:

1.       I have reviewed this annual report on Form 10-K of Tellabs, Inc.;

2.       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.       Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods present in this report;

4.       Registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13-a-15(f) and 15d-15(f)) for the registrant and have:

a)       Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)       Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding

the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)　　Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)　　Disclosed in this report any change in the Registrant's internal control over financing reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.　　The Registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the Audit Committee of the Registrant's Board of Directors (or persons performing the equivalent functions):

a)　　All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b)　　Any fraud, whether or not material, that involved management or other employees who have a significant role in the Registrant's internal control over financial reporting.

133.　　Defendant Wiggins further certified pursuant to Section 906 of Sarbanes-Oxley

that:

In connection with the Annual Report of Tellabs, Inc. (the "Company") on Form 10-K for the year ended December 31, 2010, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Timothy J. Wiggins, the Chief Financial Officer of the Company, certify, pursuant to and for purposes of 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

54

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

134. Therein, the section entitled "Management's Discussion and Analysis," in

relevant part, stated:

**Results of Operations**

Net earnings for the year 2010 grew to $155.6 million, compared with net earnings of $113.6 million in 2009. In 2008, net loss was $930.1 million when the company recorded a non-cash goodwill impairment charge of $988.3 million.

In 2010, revenue was $1,642.3 million, compared with $1,525.7 million in 2009 and $1,729.0 million in 2008. For the year 2010, revenue increased in all three segments.

In the fourth quarter of 2010, we early adopted two new required accounting standards related to revenue recognition: Accounting Standards Update (ASU) 2009-13, *Multiple-Deliverable Revenue Arrangements,* and ASU 2009-14, *Certain Revenue Arrangements That Include Software Elements.* These new standards generally result in earlier revenue recognition than under previous standards for certain deliverables in multiple-element arrangements. We adopted these standards effective as of the beginning of 201O. For the year 2010, revenue and net earnings increased by $9.1 million and $0.5 million, respectively. We adopted these standards in the fourth quarter of 20l0 on a prospective basis for new and materially modified arrangements originating in fiscal 2010. We believe the new rules best reflect the economics of those agreements over time.

***In the fourth quarter of 2010, we agreed with a North American customer to add a data product to other Tellabs products already sold to that customer through a distributor. This helps the customer better manage inventory and deployments schedules. As a result, we recognized $20.8 million in revenue in the fourth quarter of 2010 that otherwise would have been recognized in the first quarter of 2011.***

135. The statements contained in ¶¶ 101-134 above were materially false and/or

misleading when made for the reasons stated in ¶ 16(a)-(j) and statements made by Confidential

Witnesses. As a result of the above, the Defendants' positive statements about the Company's

business, operations and prospects lacked a reasonable basis and/or were materially false and/or

misleading when made.

**Disclosures at the End of the Class Period**

136.    On April 26, 2011, the Company issued a press release entitled "Tellabs first-quarter revenue totals $322 million." Therein, the Company, in relevant part, stated:

> Naperville, Ill. - Tellabs' first-quarter 2011 revenue totaled $322 million, down 15% from $379 million in the first quarter of 2010.
>
> On a GAAP basis, Tellabs recorded a net loss of $24 million or 7 cents per share in the first quarter of 2011, compared with net earnings of $46 million or 12 cents per share in the first quarter of 2010.
>
> In the first quarter of 2011, Tellabs had a non-GAAP net loss of 3 cents per share, compared with net earnings of 11 cents per share in the year-ago quarter. Non-GAAP net loss was $11 million in the first quarter of 20 11, compared with net earnings of $44 million in the year-ago quarter. Non-GAAP results exclude $7.7 million pretax or 1.4 cents after-tax per share in equity-based compensation expense.
>
> To pursue the long-term growth opportunity of the mobile Internet, Tellabs increased its research and development (R&D) investment by 16% year over year to $80 million, or 25% of first-quarter revenue.
>
> "While international revenue grew 40% from a year ago, lower revenue in North America drove Tellabs' first-quarter results," said Rob Pullen, Tellabs president and chief executive officer. "Going forward, we will continue to invest in the smart mobile Internet through increased R&D spending to position Tellabs for long-term growth."
>
> For the first quarter of 2011, Broadband segment revenue was $173 million, Transport segment revenue was $99 million and Services segment revenue was $50 million.
>
> **We expect second-quarter 2011 revenue to be up in a range from $325 million to $345 million.** We expect non-GAAP gross margin to be flat with 1Q11, plus or minus one or two points, depending on product and customer mix. We expect second-quarter non-GAAP operating expense to be down slightly in the low $140 millions.

137.    On this news, shares of Tellabs declined $0.49 per share, 9.09%, to close on April 26, 2011, at $4.90 per share, on heavy trading volume.

138.     Analysts, alike, were downbeat on this news.   Analyst Lawrence Harris of CL King & Assoc. issued a report on April 26, 2011, following Tellabs' disclosures, recognizing that AT&T was a major contributor to the disappointing financial results, noting that "AT&T has been reducing its purchases of Tellabs 5500 and 8600/8800 products." Tellabs' reported Transport sales were significantly below the analyst's previous estimate, again, based on the 5500 product.

139.     Similarly, analyst Ehud Gelblum of Morgan Stanley issued a report entitled "Tellabs: q1 QT: In-line Topline But Gross Margins Get Weaker."   Mr. Gelblum stated, "We continue to believe that TLAB is losing its air cover from the higher margin 5500 faster than originally expected…" Morgan Keegan also issued a report on the same day discussing the missed guidance and "Management offer[ing] a poor forecast calling for Q2:11 sales." The report further based its views on "a deteriorated position at AT&T."

## UNDISCLOSED ADVERSE FACTS

140.     The market for Tellabs' securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Tellabs' securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Tellabs' securities relying upon the integrity of the market price of the Company's securities and market information relating to Tellabs, and have been damaged thereby. When the material misstatements and omissions as described herein were disclosed and the risk of losing AT&T materialized, Plaintiffs and members of the Class were damaged.

141.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Tellabs' securities, by publicly issuing false and/or misleading

statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Tellabs' business, operations, and prospects as alleged herein.

142.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Tellabs' financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.    Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein. When the material misstatements and omissions as described herein were disclosed and the risk of losing AT&T materialized, Plaintiffs and members of the Class were damaged.

## COUNT I

### Violation of Section l0(b) of the Exchange Act and Rule l0b-5
### Promulgated Thereunder Against All Defendants

143.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

144.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Tellabs' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

145.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Tellabs' securities in violation of § 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

146.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Tellabs' financial wellbeing and prospects, as specified herein.

147.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Tellabs' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Tellabs and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

148.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

149.    The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Tellabs' financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to

obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

150.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Tellabs, his/her control over, and/or receipt and/or modification of Tellabs' materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Tellabs, participated in the fraudulent scheme alleged herein, including but not limited to:

- CW 1 had numerous discussions with Tellabs Chief Executive Officer ("CEO"), Rob Pullen ("Pullen") regarding the expected loss of AT&T revenue. They discussed specific details of how fast AT&T would be able to implement the product changes in its networks and how soon that would impact the AT&T revenue stream at Tellabs.

- CW 1 participated in quarterly sales account reviews with Defendant Wiggins. In 2010, those reviews included CW 1's projections about how fast AT&T could phase out its purchases from Tellabs and how soon it would impact Tellabs' revenue stream. CW 1 stated that Defendant Minichiello was Wiggins "right hand man" and crunched all the company finances. "Any number going in or out, [Wiggins] knew about."

- CW 1 also issued quarterly sales account reports, which he submitted to his supervisors, which was supposed to end up with Wiggins and was to be released to the public and "The Street." In CW 1's reports from 2010, CW 1 projected that AT&T sales would continue to decline dramatically.

- CW 3 corroborated CW 1 and CW 2's statements that by 2010, it was well known to Tellabs that the 5500 had already peaked and was in decline. The 5500 could

not support the superfast bandwidth speed that customers now demanded, and as a result, sales declined.

- CW 4 corroborated CW 1, 2 and 3's statements that Tellabs' 5500 product was old technology and obsolete. Tellabs knew even before 2009 that all the telecommunication providers would be moving away from this old technology and that they would no longer be buying the products that supported this old technology, like the 5500. Tellabs sales of its 5500 were declining in 2008 and 2009 due to AT&T and others purchasing less of this product.

- As reported by CW 3, Tellabs held "town hall meetings" each quarter after releasing the company Quarterly Reports. During the meetings, which were held at Naperville headquarters and broadcast companywide via Webinar, CEO Rob Pullen and CFO Tim Wiggins discussed how the company had performed that quarter. Pullen introduced the meeting and Wiggins provided the financial details about the quarterly reports.

- CW 9's team was responsible for calculating revenue each quarter. Once completed, the team's internal revenue report was given to Tellabs' top executives, including Defendants Wiggins and Minichiello. According to team's internal calculations, the 2010 Q4 revenue did not meet the $410 million in profit the company previously forecast. CW 9 said that revenue was several million dollars below its forecasted revenue for 2010Q4.

- CW 9 said the team of directors also prepared quarterly and yearly forecast reports for Tellabs top executives, including Defendants Wiggins and Minichiello. In 2010 and 2011, these reports forecast a trend of declining sales.

- CW 9 also corroborated that the 8800 and 8600 products were targeted to AT&T, but the products never became a big seller.

151. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market prices of Tellabs' securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public

statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Tellabs' securities during the Class Period at artificially high prices and were damaged thereby. When the material misstatements and omissions as described herein were disclosed and the risk of losing AT&T materialized, Plaintiffs and members of the Class were damaged.

152.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Tellabs was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Tellabs securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

153.    By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

154.    When the material misstatements and omissions as described herein were disclosed and the risk of losing AT&T materialized, Plaintiffs and members of the Class were damaged.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

155.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

156.    The Individual Defendants acted as controlling persons of Tellabs within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their  ownership and contractual rights, participation in and/or awareness of the Company's

operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

157.    As set forth above, Tellabs and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20( a) of the Exchange Act.  When the material misstatements and omissions as described herein were disclosed and the risk of losing AT&T materialized, Plaintiffs and members of the Class were damaged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated:   June 3, 2013                              Respectfully submitted,

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP**

By: _/s/Leigh Handelman Smollar_
Patrick V. Dahlstrom
Leigh Handelman Smollar
Louis C. Ludwig
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Phone: 312-377-1181
pvdahlstrom@pomlaw.com
lsmollar@pomlaw.com
lcludwig@pomlaw.com

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP**
Marc I. Gross
Jeremy A. Lieberman
600 3rd Avenue, 20th Floor
New York, New York 10016
Phone: 212-661-1100
migross@pomlaw.com
jalieberman@pomlaw.com

_Lead Counsel for Lead Plaintiffs and the Proposed Class_

**GLANCY BINKOW & GOLBERG LLP**
Lionel Z. Glancy
Rob Prongay
Joshua Crowell
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: (310) 201-9150

*Counsel for Plaintiff Alfredo Acosta*