# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MAHMOOD ALIZADEH, on behalf of himself and all others similarly situated,   )
)
)
Plaintiff,   )   No. 13 C 537
)
v.   )
)   Judge Sara L. Ellis
TELLABS, INC., TIMOTHY J. WIGGINS,   )
and THOMAS P. MINICHIELLO   )
)
Defendants.   )

## OPINION AND ORDER

Plaintiffs bring this putative securities class action against Tellabs, Inc., Timothy Wiggins, and Thomas Minichiello, alleging that Defendants made false or misleading statements or omissions with regard to Tellabs' earnings and performance from June 9, 2010 through April 26, 2011 (the "Class Period"). Lead Plaintiffs Brian Jensen and Alfredo Accosta bring this case on behalf of themselves and all others who purchased Tellabs securities during the Class Period. Plaintiffs allege that Defendants perpetrated a fraud on the market and that Tellabs' stock price was artificially inflated throughout the Class Period as a result of Defendants' misstatements. Now before the Court is Defendants' motion to dismiss the Second Amended Complaint ("SAC"). Because Plaintiffs fail to adequately allege that any of Defendants' material statements were false or misleading, or that Tellabs omitted information such that statements were rendered misleading, and because Plaintiffs also fail to allege that Defendants acted with scienter, the Court grants the motion to dismiss [94] and dismisses the SAC [92] with prejudice.

# BACKGROUND[1]

Tellabs designs and develops telecommunications network products, which it sells primarily to telecommunications service providers. Tellabs' business can be divided into three segments: broadband, transport, and services. Tellabs stock is traded publicly on the National Association of Securities Dealers Automated Quotations Market ("NASDAQ"). During the Class Period, Defendant Timothy Wiggins served as Tellabs' Chief Financial Officer and Defendant Thomas Minichiello was Tellabs' Chief Accounting Officer.

In 2010, AT&T was one of Tellabs' biggest customers, accounting for 35% of Tellabs' revenue. But this was unlikely to last, as AT&T had announced by the beginning of the Class Period that it would buy its telecommunications infrastructure products only from "domain suppliers." Doc. 92 ¶ 7. Tellabs was not included on AT&T's list of domain suppliers, but it continued to compete for AT&T's business. Further predicting Tellabs' declining revenues, executives announced at a companywide quarterly meeting in early 2010 "that sales and installation revenues were dropping and that cost cutting was required." *Id.* ¶ 73.

At the beginning of the Class Period, the industry was moving from 2G technology to 3G networks. With the introduction of the iPhone, the mobile internet market ballooned and AT&T experienced "an explosion of demand for bandwith in 2010." *Id.* ¶ 71. To satisfy demand, AT&T purchased large quantities of Tellabs products, including the 5500 Digital Cross-Connect

---

[1] The facts in the background section are taken from the SAC and documents incorporated by reference therein and are presumed true for the purpose of resolving Defendants' motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007). A court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment. *Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009). Where a document is referenced in the complaint and central to a plaintiff's claims, however, the Court may consider it in ruling on the motion to dismiss. *Id.* The Court may also take judicial notice of matters of public record. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080–81 (7th Cir. 1997).

(the "5500"). The 5500 supported the 2G network, and was therefore nearing obsolescence in

2010. Nevertheless, because AT&T could not meet 3G demand, it purchased $120 million worth

of 5500s in 2010 to bolster its fallback 2G network. In light of AT&T's earlier announcement

and the industry's clear move away from 2G systems, however, these sales constituted a

temporary fix rather than an emerging trend.

### Statements Regarding Sales to AT&T

During the Class Period, Tellabs made several statements regarding the company's

current orders from AT&T and a few statements regarding future sales to AT&T. In June of

2010, Wiggins stated that AT&T had not yet begun to reduce its orders: "What we're seeing in

the current term is no degradation of the orders from the customer, but in fact we're seeing

stronger orders than we expect." *Id.* ¶ 112. At the same time, an unidentified Tellabs

representative suggested that the company's products would not become obsolete as fast as some

had predicted: "The solution we're providing to AT&T has a longer life and a longer runway in

the network than the market has given it credit for." *Id.* ¶ 110.

A new competitor emerged during the first half of 2010, exacerbating Tellabs' challenges

retaining AT&T's business. Previously, Tellabs' only competitor in this space was Cisco. But

Alcatel-Lucent emerged with a plan to offer AT&T a pure ethernet product to support its

network. Wiggins described this new competition on a June 10, 2010 investor conference call,

stating that Alcatel-Lucent "has come to AT&T and made a proposal to offer pure ethernet in

their backhaul. And we believe they're—they've been granted a trial. So we moved from two

hunting licenses to three." Doc. 98-1 at 74 of 137.[2] After stating that AT&T had not reduced its

---

[2]   Document 98-1 contains 13 exhibits submitted by Defendants. The Court may consider Defendants' exhibits 1–4, 6, and 8–12, constituting conference call transcripts, an analyst report, and press releases, because each of these exhibits was quoted in and/or central to the SAC. *Hecker*, 556 F.3d at

orders from Tellabs up to that point, Wiggins warned: "what we're gathering is that certainly the customer would prefer over time to put a pure Ethernet system in, because if you think about the cost difference between multi-service and Ethernet, it's a—the pure Ethernet is probably a third less expensive." *Id.* Wiggins explained that because it would take time for Alcatel-Lucent to develop its network and win AT&T's business, "what we expect for the balance of the year is a continued growth in our data products[.]" *Id.* at 75. Alcatel-Lucent ultimately won AT&T's business and took market share from Tellabs.

Along these lines, Tellabs often acknowledged its challenges in competing for AT&T's future business, while noting that current orders remained strong. On July 27, 2010, CEO Rob Pullen stated:

> [Y]ou're going to have to talk to AT&T about specifics in their network. But what I can tell you is that we're in the network today in the 3G network. Like all customers around the world, I would expect as customers are telling me, they want to get a return on investment on their 2G and 3G asset and that will be in the network a very long time.

*Id.* at 11.

On that same day, after acknowledging that Tellabs' stock price had dropped on news of weak sales to AT&T, Pullen again referred to the new competitor for AT&T's business, stating:

> While I can't speak for our customer, we do know that AT&T is trialing a third vendor in its mobile back-haul networks. At the same time, Tellabs sees good demand from AT&T. We're in the network now. We're seeing growth on the embedded base. And we believe we offer the lowest risk and the least cost evolution to the long-term evolution in the mobile backhaul.

582–83. Regardless from which exhibit a particular statement comes, the Court will cite to Doc. 98-1 and the page number "of 137" identified atop each page.

4

*Id.* at 7.  When asked on that same call about concerns with AT&T, Pullen reiterated, "the AT&T issue is real.  So, we wanted to address that head-on.  But we believe that through our own direct channels and our partnership, we can continue to overcome that."  *Id.* at 19.

In August of 2010, Pullen indicated that a new competitor had emerged for AT&T's business:

> our orders still remain very good and we are approved in their mobile backhaul and obviously, it's growing demand there.  As I shared on the earnings call, we do know that they are about to introduce a new vendor into the mix, but we continue to be deployed in their current business and it's a big and growing marketplace.  We will continue to do well there.

*Id.* at 7.

Most clearly, when asked on an October 2010 earnings conference call whether sales of 5500s would continue to grow in 2011, Wiggins responded, "lightning probably won't strike twice.  I don't think so."  *Id.* at 41.

### WiChorus

To meet demand for next generation networks—known as "4G"—Tellabs began developing the 8900, which was intended to replace the 8800.  Sales of the 8800 were responsible for "more revenue than any other [Tellabs] product" during the first two quarters of 2010.  *Id.* at 8.  But at some point not specified in the SAC, Tellabs switched focus, cutting its research and development budget in the 8900 and investing instead in products first developed by WiChorus, Inc., a company Tellabs acquired in December of 2009.  However, the WiChorus products were slow to roll out and ultimately failed to recapture Tellabs' market share.  In a report from June of 2010, an analyst with CL King & Associates stated that "the proposed Tellabs WiChorus solution would be available next year."  Doc. 92 ¶ 116.

**Juniper**

Plaintiffs contend that Tellabs also misrepresented its relationship with a company called Juniper, one of AT&T's domain suppliers. A Tellabs representative stated in August of 2010, "[a]lso recently I was speaking with Kevin Johnson at Juniper and we have our products interoperating around the world for customers as well. And so our equipment's in their lab, we're doing interoperability testing with them for customers around the world, including AT&T." *Id.* ¶ 134. But Tellabs ultimately "refused to enter into a business relationship with Juniper." *Id.* ¶ 136.

**Wiggins' Stock Purchases**

From August of 2009 until May of 2010, Wiggins sold shares of Tellabs stock on ten occasions. Plaintiffs assert that these sales were "dramatically out of line" with two prior periods in 2008 and 2009, and that "Wiggins' sales are directly in line with his knowledge of the impending decline of the AT&T business." *Id.* ¶ 14. The SAC includes a chart identifying Wiggins' sales and holdings during three separate periods. The chart indicates that despite the sales, Wiggins' Tellabs holdings increased by over forty percent in the ten months preceding the Class Period.

**Pullen's Compensation Scheme**

Tellabs CEO Rob Pullen received an incentive-based compensation package in 2010 worth over $3 million. Much of Pullen's compensation hinged on Tellabs' ability to reach certain annual benchmarks, including: gross margin of 45%, total revenues exceeding 1.6 billion, "operating expense ratio" of at least 34.3%, and "increase in growth product revenue" of 30.4% or more. *Id.* ¶ 15. Tellabs achieved its gross margin and total revenue goals with a gross margin percentage of 48.3% and $1.642 billion in revenues in 2010. It fell short of the other two

benchmarks, with an operating expense ratio of 33.9% and an increase in growth product revenue of 29.4%.

## Internal Tellabs Emails

Plaintiffs attach to the SAC several emails from Tellabs employees and executives regarding revenue projections for 2010 and 2011. Plaintiffs allege that these emails show that Tellabs employees "were extremely worried about the impact of the declining AT&T sales on revenue" and that Tellabs "executives were clear that AT&T sales were expected to decline." *Id.* ¶ 114.

On June 4, 2010, Stan King emailed Chuck Bernstein and Pullen, forecasting that Tellabs would sell $260 million worth of products to AT&T during the second half of 2010. After providing the forecast, King stated, "[r]emember, it's a forecast. And the customer is ATT." Doc. 92-1 at 1. In response, Bernstein said, "I remember is [sic] a forecast and we have a Revenue and Bookings goal that needs to be met. You have yours for ATT to me and I have my North America for Rob. Let's sell our tails off. $260M for ATT 2H 2010 is the target." *Id.*

In an email dated August 17, 2010, Patrick Green of Tellabs provided a projection for 2011 to Wiggins, Pullen, Minichiello, and other Tellabs employees. The email was "driven off of the 'negative alert'" by analysts from J.P. Morgan warning investors that Tellabs' sales to AT&T "were at risk for 2011." Doc. 92-2 at 1. Green projected between $160 million and $400 million in 2011 sales to AT&T Mobility, with a "mid" projection of $275 million.

## Revenue Projections and Disclosures for Fourth Quarter of 2010 and First Quarter of 2011

In October of 2010, Tellabs projected fourth quarter revenues between $410 and $430 million. Pullen noted that "North American revenue [was] forecast to be down" during the

fourth quarter of 2010.  *Id.* at 25.  Pullen also noted that this decline in forecast sales was due to loss or market share in North America.  *Id.* at 39.

On January 25, 2011, Tellabs reported fourth quarter revenues of $410.5 million, at the low end of the guidance range.  This represented a 5% increase from fourth quarter 2009 revenue, but a net loss of $11 million on a GAAP basis.  Tellabs also disclosed that this figure was $30 million higher than it otherwise would have been but for a few policy changes.  First, Tellabs disclosed that fourth quarter revenues included $20.8 million that would have otherwise been recognized in the first quarter of 2011.  Tellabs explained that this $20.8 million "reflected [an] agreement with a North American customer to add [Tellabs'] data product to other products already sold to this customer through a distributor."  Doc. 92 ¶ 143.  Tellabs stated that the company anticipated this change when it set fourth quarter projections.  However, Confidential Witness ("CW") 9 asserts "that Tellabs did not plan to recognize that extra revenue when making projections for 4Q 2010 in October 2010."  *Id.* ¶ 140.  Plaintiffs allege that "the internal report CW 9's team provided to top executives was approximately $25 million less than the 4Q 2010 report released to the public—almost the exact amount of the prematurely recognized revenue." *Id*.  Second, Tellabs disclosed that the reported fourth quarter revenue included the early adoption of "two required accounting standards related to revenue recognition" that "generally result in earlier revenue recognition than under previous standards[.]"  *Id.* ¶ 142.  The adoption of these accounting standards further increased Tellabs' fourth quarter revenue by $8.8 million and its annual revenue by a total of $9.1 million.  Wiggins stated that when the company set its guidance it did not anticipate early-adopting these standards such that they would affect fourth quarter revenues.

Wiggins also noted that Tellabs' "customer concentration"—the percentage of the company's revenue that come from AT&T and Verizon—"was down significantly" in the fourth quarter, which was "primarily due to AT&T." *Id.* ¶ 21. Pullen then said, "we had shared with you last quarter that [AT&T] introduced a new vendor into mobile backhaul. That market share transition is happening." Doc. 98-1 at 58. On this same day, Tellabs estimated first quarter 2011 revenue of between $315 and $335 million. On the news of Tellabs' fourth quarter earnings and first quarter guidance, Tellabs' stock price declined by almost 20% on January 25, 2011.

On April 26, 2011, the last day of the Class Period, Tellabs announced first quarter revenue of $322 million. This was within the company's guidance, but well below the $379 million that Tellabs brought in during the first quarter of 2010. It also amounted to "a net loss of $24 million or 7 cents per share in the first quarter of 2011." Doc. 92 ¶ 25. Tellabs set second quarter guidance at $325 to $345 million. Tellabs CEO Rob Pullen noted that the company "continue[d] to see global competition, fierce competition around the world." *Id.* ¶ 26. On this news, Tellabs' stock price fell by 9% on April 26th.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.

Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted). Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'— in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

On top of the burden imposed by Rules 12(b)(6) and 9(b), Congress further heightened the pleading standards on securities fraud claims when it enacted the Private Securities Litigation Reform Act ("PSLRA") to curb pleading abuses in private securities fraud suits. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* ("*Tellabs II*"), 551 U.S. 308, 313–14, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). In a 10b-5 action for securities fraud, a plaintiff must allege and ultimately prove:

> (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation"; (5) economic loss; and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) (emphasis omitted) (citations omitted). In order to adequately allege that defendants misrepresented or omitted material facts, the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is

misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In pleading scienter, the PSLRA requires that plaintiffs, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). For an inference to be "strong," it must be "cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs II*, 551 U.S. at 324.

## ANALYSIS

In short, Plaintiffs allege that Defendants violated § 10(b) and SEC Rule 10b-5 by making material misstatements about Tellabs during the Class Period which artificially inflated the company's stock price to the detriment of the putative class members. Plaintiffs also seek to hold Wiggins and Minichiello liable under Securities Exchange Act § 20(a) as controlling persons in the company.

Rule 10b-5 forbids "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Previously, the Court granted Defendants' motion to dismiss the First Amended Complaint on the grounds that Plaintiffs had improperly engaged in puzzle pleading by quoting Tellabs statements at length and then alleging that all of the quoted statements were false or misleading. Doc. 85. But the Court afforded Plaintiffs an opportunity to amend their complaint to cure these deficiencies by more closely linking each of the alleged misstatements with Plaintiffs' rationale for why that particular statement was false.

In the SAC, Plaintiffs allege that Tellabs misled the market throughout the Class Period by failing to disclose that sales to AT&T would diminish because Tellabs products were nearing obsolescence and none of Tellabs' new products were likely to recapture the company's market share. Plaintiffs claim that because the market did not understand that Tellabs was likely to lose AT&T's business, the company's stock price was artificially inflated throughout the Class Period. Therefore, Plaintiffs assert that investors who purchased Tellabs stock during that time were harmed by the misstatements or omissions. Plaintiffs assert that "the house of cards began to tumble" in January of 2011 when the company released its fourth quarter 2010 earnings and its guidance for the first quarter of 2011. Doc. 92 ¶ 142. The company's fourth quarter earnings were allegedly propped up by "questionable" accounting tactics that allowed the company to realize $30 million in revenues in the fourth quarter of 2010 rather than in 2011. *Id.* ¶ 103. But Plaintiffs acknowledge that Tellabs disclosed each of these changes when the company made its disclosures. Nevertheless, Plaintiffs allege that the truth was not finally revealed until April of 2011, when Tellabs announced first quarter revenues of $322 million, down 15% from the first quarter of 2010.

In moving to dismiss, Defendants primarily contend that Plaintiffs fail to sufficiently claim that any of Defendants' statements were false or misleading, or that Defendants acted with scienter. Additionally, Defendants argue that any 10(b) claims against Wiggins or Minichiello must be limited to the statements those Defendants themselves made, and that Plaintiffs fail to state a claim for control person liability under § 20(a) because they fail to allege an underlying violation of § 10(b). Because the Court agrees with Defendants that Plaintiffs fail to adequately allege that any of Defendants' statements were false or misleading when made, or that

Defendants acted with scienter, the Court will not address Defendants' other arguments at this time.

## I.     Puzzle Pleading

Within the 61 page complaint, Plaintiffs quote several statements made by Tellabs representatives during the Class Period. The SAC alleges that nearly all of these statements were false or misleading when made, usually because they failed to explicitly predict and disclose Tellabs' impending decline in revenue. When alleging that a statement was misleading, as Plaintiffs do here, the PSLRA requires the complaint to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" 15 U.S.C.A. § 78u-4(b)(1)(b).

While the SAC is less reliant on block quotations than the First Amended Complaint, it is not always clear to even the keenest reader which statements Plaintiffs challenge. The most extreme example is found in paragraph 154 of the SAC, where Plaintiffs allege "[t]he statements contained in ¶¶ 151–153 above were materially false and/or misleading when made because, by this time, Tellabs' existing products had aged and its top sellers were known to have expiring shelf life." Doc. 92 ¶ 154. But paragraphs 151 through 153 contain two single-spaced pages of block quotations from Tellabs representatives. Plaintiffs do not make clear which statements within those two pages were false or misleading when made. This places an additional burden on the Court—requiring it to "determine precisely which statements Plaintiffs consider to be fraudulent." *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.* ("*Garden City I*"), No. 09-CV-5641, 2011 WL 1303387, at *21 (N.D. Ill. Mar. 31, 2011). The Court notes, as other courts have, that such a long complaint with extensive block quoting is "not [an] uncommon mask for an absence of detail." *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1011 (N.D. Ill. 2004)

(quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)).  But given the significant improvement over the First Amended Complaint and the relatively few instances of such puzzle pleading the Court will wade through the SAC to identify any statements attributed to Tellabs during the Class Period which might have been false or misleading.

## II.     Alleged False or Misleading Statements

Because the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), it is not sufficient to merely claim that a statement was false or misleading.  Instead, Plaintiffs must state with particularity the facts—known to the speaker at the time—that render the statement false or misleading.  *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.* ("*Garden City II*"), No. 09-CV-5641, 2012 WL 1068761, at \*4 (N.D. Ill. Mar. 29, 2012) ("Plaintiffs must explain, with particularity, the factual basis for their assertion that the statement was untrue."); *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1000 (E.D. Wis. 2009) (dismissing complaint because it lacked "fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made").  When alleging that Defendants omitted something, "'plaintiffs must point to a specific statement that is made misleading by [an] omission,' and offer 'specific, contradictory information' known to [Defendants] sufficient to establish that [Defendants] made any misleading statements."  *Garden City II*, 2012 WL 1068761, at \*5 (first alteration in original) (citations omitted).  Put another way, in evaluating whether Plaintiffs have adequately pleaded falsity, the Court must determine "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission."  *Makor Issues & Rights, Ltd. v. Tellabs, Inc.* ("*Tellabs I*"), 437 F.3d 588, 596 (7th Cir. 2006) (quoting *Novak v. Kasaks*, 216 F.3d

300, 314 n.1 (2d Cir. 2000)), *vacated and remanded on other grounds*, 551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). As set out below, Plaintiffs fail to adequately allege that any of Defendants' material statements during the Class Period were false or misleading.

## A.     June of 2010

The Class Period began on June 9, 2010, when an unidentified Tellabs representative told Reuters that "the solution we're providing to AT&T has a longer life and a longer runway in the network than the market has given it credit for." Doc. 92 ¶ 110. The SAC states that "[a]nalysts ate this up, and, as a result, issued positive reports regarding Tellabs." *Id*. However, the SAC does not even allege that this statement was false or misleading. But in their response to the motion to dismiss, Plaintiffs assert that "the statements were materially false and/or misleading because by this time, the Defendants knew that any uptick in sales due to the 5500 was a temporary band-aid to its problems as the 5500 was an outdated product that was being used as a fallback option." Doc. 99 at 19. First of all, Tellabs' statement was so "vaguely optimistic" as to be immaterial. *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164–65 (N.D. Ill. 2004) (dismissing claim as to "vaguely optimistic" statement as immaterial). "Scrutiny of vaguely optimistic statements for immateriality as a matter of law is 'especially robust' in cases involving a fraud-on-the-market theory of liability, such as this one, because the hypothetical 'reasonable investor,' by reference to whom materiality is gauged, is 'the market' itself." *Id.* at 1164 (citations omitted). Tellabs did not state or suggest that sales of 5500s would continue at their current level for any discernible length of time such that anyone could reasonably rely on that statement. And the statement was so vague that it would be impossible for the Court to determine whether it was true or false, as doing so would require answering the inexact question

of how long a "runway in the network" the "market ha[d] given [Tellabs products] credit for" as of June 9, 2010.  Doc. 92 ¶ 110.

Additionally, as with many of the alleged misstatements, Plaintiffs' rationale for why this statement was false or misleading does not actually contradict the company's statement.  Tellabs' June 9 statement is fully reconcilable with Plaintiffs' claim that sales of 5500s would lag in the future.  Tellabs stated merely that its products had "a longer life and a longer runway in the network than the market has given it credit for."  *Id.*  Plaintiffs assert that this statement was false or misleading because the spike in sales of 5500s to AT&T was a "temporary band-aid."  Doc. 99 at 19.  But Tellabs did not imply that sales of 5500s would continue at their current pace or at any particular level.  Thus, the Court dismisses any allegations based on the June 9, 2010 statement to Reuters.

Next, Plaintiffs quote three paragraphs of an earnings call transcript from June 10, 2010.  On this call, Wiggins stated that "in the current term" AT&T's orders of the 8800 had not degraded, that he expected "continued growth in our data products" during the second half of 2010, and that "even if the customer decides to make some changes at the cell site, that the strength of the orders we're seeing in the core would likely overcome that."  Doc. 92 ¶ 112.  Plaintiffs allege that "[t]he statements referenced in ¶ 112 above are materially false and/or misleading because by this time, Tellabs' existing products had aged and its top sellers were known to have an expiring shelf life."  *Id.* ¶ 113.  But again, Plaintiffs' factual allegations do not actually contradict Wiggins' statements or even call them into doubt.  *See Garden City I*, 2011 WL 1303387, at *21 ("Plaintiffs fail to offer 'specific, contradictory information' presumably known to Individual Defendants in July that is sufficient to establish this proposition.").  Instead, Plaintiffs allege that the "shelf life" of Tellabs products would soon run out and that therefore the

company's sales would decline at some point in the future. While Tellabs' sales eventually declined, Plaintiffs have not identified anything in Wiggins' statements on June 10, 2010 that was false or even misleading at the time it was made. Wiggins stated that "in the current term" sales of 8800s to AT&T "had not degraded." Doc. 92 ¶ 112; *Garden City II*, 2012 WL 1068761, at *10 (a statement that is, on its face, limited to the past is not actionable as a misleading projection of future performance). In fact, as Tellabs announced the following month, sales of the 8800 were robust during the first two quarters of 2010, accounting for "more revenue than any other [Tellabs] product" during that time. Doc. 98-1 at 8.

Nor can Plaintiffs plausibly allege that Wiggins lied or misled the market when he stated that he anticipated "continued growth in our data products" during the third and fourth quarters of 2010. Doc. 92 ¶ 112. Plaintiffs allege that this statement was false because sales of 5500s to AT&T would not continue to grow. But 5500s were just one piece of Tellabs' data business, and AT&T was just one of Tellabs' customers. Impending weakness in one part of Tellabs' data business "would not necessarily render untrue positive statements about the [data business] as a whole." *Garden City I*, 2011 WL 1303387, at *23. Thus, because Plaintiffs do not offer any facts that might support their claim that Wiggins' forward looking statement was untrue, their claim with regard to this statement must fail.

Additionally, Tellabs was under no duty to inform investors regarding general conditions of the telecommunications market that were already in the public domain. *Garden City I*, 2011 WL 1303387, at *21, 22 ("Defendants were not required to publicly disclose to the markets statements about the general condition of the global economy;" "Defendants do not commit securities fraud by failing to specifically alert investors to the general condition of certain segments of the market."). Plaintiffs allege that Tellabs' statements were untrue because sales of

5500s were bound to falter as providers switched to 3G and ultimately to 4G. But it is clear from the SAC that the age and limitations of the 5500 were well known to the market during the Class Period, as "the industry was moving towards 3G and the 5500 supported only 2G." Doc. 92 ¶ 127. Because the weaknesses of the 5500 were well known in the marketplace, the company had no duty to remind investors or analysts of this information.

As for Wiggins' forward-looking statement on the June 10 conference call regarding continued growth of Tellabs data products, Plaintiffs have not alleged "actual knowledge" of falsity, as required by the PSLRA. The safe harbor provision of the PSLRA protects forward-looking statements "if and to the extent that" (a) the statement was identified as forward-looking and was accompanied by "meaningful cautionary statements" or (b) Plaintiffs fail to demonstrate that the forward-looking statement was "made with actual knowledge that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1). And at the pleading stage, Plaintiffs "must state with particularity facts giving rise to a strong inference that the defendant had actual knowledge of the falsity of the statements." *Selbst v. McDonald's Corp.*, No. 04 C 2422, 2005 WL 2319936, at *19 (N.D. Ill. Sept. 21, 2005).

In order to demonstrate Wiggins' actual knowledge that data sales would not continue to grow, Plaintiffs rely on an email chain dated June 4, 2010. Plaintiffs allege that these emails show that Tellabs personnel "were extremely worried about the impact of the declining AT&T sales on revenue." Doc. 92 ¶ 114. Plaintiffs state:

> In showing their worry about the uncertainty of future AT&T sales, [Tellabs' Director of Sales to AT&T Stan] King stated, "Remember, it's a forecast. And the customer is ATT." In response, [Vice President of Wireless Sales Charles] Bernstein stated, "Remember it's a forecast and we have a Revenue and Bookings goal that needs to be met."

*Id.* ¶ 115. But these emails are not nearly the smoking gun that Plaintiffs make them out to be. In fact, even reading the emails in the light most favorable to Plaintiffs, there is nothing suspicious about them. Although the emails may not demonstrate certainty, they do not say anything pessimistic or foreboding about sales to AT&T. In fact, they predict $260 million in sales to AT&T during the second half of 2010, which Plaintiffs do not allege would be a decline from sales in any identifiable period. At most, the emails implied that forecasts are inherently uncertain and that sales to AT&T were an important part of the company's business. But this is not surprising, as it is not unusual for sales forecasts to include some level of doubt, and it is clear that AT&T was an important customer to Tellabs.

Moreover, Tellabs had informed the market about the uncertainty of retaining AT&T's business in the medium- or long-term future. Wiggins stated on June 10, 2010 that Alcatel-Lucent had proposed to offer AT&T a pure ethernet solution that, once developed, would be approximately one-third less expensive to AT&T. Doc. 98-1 at 74–75. But it would take time for Alcatel-Lucent to develop such a network because a pure Ethernet solution would "require that backhaul be fiber," and as of June of 2011 "AT&T use[d] copper, particularly in rural areas." *Id.* at 85. Analysts predicted that even in 2013, more than 50% of AT&T's backhaul connections would be copper. *Id*. Wiggins explicitly acknowledged that whenever Alcatel-Lucent's ethernet network became available, AT&T "would prefer" to switch. *Id.* at 74. In sum, the emails demonstrate that Tellabs was confident about sales to AT&T for at least the duration of the year. *Id*. As for the longer term, Plaintiffs do not identify any statements guaranteeing or even implying that Tellabs would retain AT&T's business. And even if Plaintiffs could point to such a statement, it would have to be read in light of all of the facts known to the market,

including Wiggins' acknowledgment that sales to AT&T may be jeopardized once Alcatel-Lucent's solution became available.

Plaintiffs further allege that Tellabs made material misstatements regarding WiChorus in June of 2010 because analyst Lawrence Harris of CL King & Associates wrote on June 11, 2010 that "the proposed Tellabs WiChorus solution would be available next year." Doc. 92 ¶ 116. Plaintiffs do not identify which Tellabs employee might have provided this information to Harris or when he or she might have done so. In fact, Plaintiffs do not even allege that any Tellabs representative gave this information to Harris at all. Nevertheless, Plaintiffs claim that this statement was false when made because "CW 1, 7, and 8 all confirmed that WiChorus had failed miserably by this point, and was unable to produce any products." *Id.* ¶ 117. But the specific statements in the SAC attributed to confidential witnesses 1, 7, and 8 do not support the claim that Tellabs knew in June of 2010 that no WiChorus products would be released in 2011. *See Harley-Davidson*, 660 F. Supp. 2d at 986 (analyzing the confidential witnesses' particularized statements, rather than relying on the plaintiffs' representations of those statements). Instead, CW 8 stated that "[i]n 2010, Tellabs began to invest heavily in WiChorus mobile internet product development, and Tellabs was aggressively trying to market products that had not been fully developed." Doc. 92 ¶ 88. This corresponds with Tellabs' assertion that it planned to release a WiChorus product in 2011—and it certainly does not support Plaintiffs' claim that all WiChorus products had terminally failed by June of 2010. In short, Plaintiffs do not sufficiently support their allegation that whoever provided this statement to Harris—if anyone from Tellabs actually did—knew when he or she made the statement that Tellabs was not going to roll out *any* WiChorus product at any time during 2011. The fact that Tellabs may not have actually

introduced any WiChorus products in 2011[3] does not mean that this statement was known to be false when made. *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) ("[T]here is no fraud by hindsight."); *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1332 (7th Cir. 1995) ("[T]he securities laws typically do not act as a Monday Morning Quarterback."). Therefore, Plaintiffs fail to state a claim with regard to any of Defendants' statements during June of 2010.

## B.    July of 2010

Plaintiffs next allege that Pullen's statements on a July 27, 2010 conference call were false or misleading when made. Plaintiffs quote several paragraphs from Pullen and allege that "[t]he statements referenced in ¶ 126 above were materially false and/or misleading." Doc. 92 ¶ 127. To provide context for each of the allegedly misleading statements on the July 27 conference call, the Court notes that Pullen also acknowledged on the call that the company would face fierce competition for sales to AT&T. Specifically, when an analyst voiced concerns regarding whether Tellabs could retain AT&T's business, Pullen acknowledged that "the AT&T issue is real," Doc. 98-1 at 19, and that Tellabs would have to "battle this out day-by-day in the field" in order to retain AT&T's business, *id.* at 20.

Specifically, Plaintiffs allege that Pullen lied when he said "what I can tell you is, is that we're in the network today in the 3G network." Doc. 92 ¶ 126. Plaintiffs contend that "by this time, Tellabs' existing products were not 'in the network[.]'" *Id.* ¶ 127. But this assertion does not correspond with any of the facts as pleaded in the SAC and is not supported by any statements from the confidential witnesses. *See Harley-Davidson*, 660 F. Supp. 2d at 988

---

[3]    The SAC does not explicitly allege that Tellabs did not actually release any WiChorus products in 2011. But whether or not Tellabs released any WiChorus products in 2011 is not the pertinent inquiry. Plaintiffs' claim with regard to this statement hinges on whether Defendants knew in June of 2010 that Tellabs would not release any WiChorus products in 2011 but led the market to believe that the company would release a WiChorus product.

(rejecting plaintiffs' bare contention that was "untethered to any supporting facts").  Nowhere

else in the SAC do Plaintiffs allege that Tellabs products were not utilized in AT&T's 3G

network in July of 2010.  Rather, it is plain from the facts alleged in the SAC that AT&T

purchased hundreds of millions of dollars' worth of Tellabs products from 2009 to 2011 to build

its networks.  In an email that Plaintiffs rely on dated August 17, 2010, Tellabs' Pat Green stated

that "[t]otal AT&T 8600/8800/5500 (Mobility) revenues in 2010 will be $495M."  Doc. 92-2 at

1.  Indeed, Plaintiffs reshape this claim considerably in their response to the motion to dismiss,

stating:

> Defendants' attempt to explain that "in the network now" means
> that their current sales were fine, and that customers would
> continue to use 2G and 3G networks.  However, the impression
> Defendants gave to the market when looking at the conference call
> as a whole was that sales were continuing to grow, and that there
> was no concern with respect to AT&T.

Doc. 99 at 23 (citation omitted).  However, the Court must take Pullen's statement at face value.

*Fulton County Emps.' Ret. Sys. v. MGIC Inv. Corp.*, No. 08-C-0458, 2010 WL 601364, at *12

(E.D. Wis. Feb. 18, 2010), *aff'd* 675 F.3d 1047 (7th Cir. 2012); *In re Nokia Oyj (Nokia Corp.)*

*Sec. Litig.*, 423 F. Supp. 2d 364, 404 (S.D.N.Y. 2006) (rejecting plaintiffs' interpretation of a

statement as "not reasonable considering the entire context of the statement and the other

statements included in the [complaint]").  Pullen stated simply that Tellabs equipment was "in

the network," meaning that AT&T had integrated Tellabs devices in its 3G network and was

utilizing those devices in operating its network as of July 27, 2012.  Plaintiffs cannot construe

Pullen's statement into an assurance that sales to AT&T "were continuing to grow, and that there

was no concern with respect to AT&T."  Doc. 99 at 23; *see Plumbers & Pipefitters Local Union*

*No. 630 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Solutions, Inc.*, 778 F. Supp.

2d 858, 878 (N.D. Ill. 2011) (rejecting plaintiff's claim that a statement was misleading, holding

that "in its actual context a reasonable investor would not arrive at the conclusion Plaintiff proposes"). Thus, Plaintiffs cannot demonstrate that Pullen's assertion that Tellabs was in AT&T's network was false or misleading when made.

Plaintiffs also take issue with Pullen's statement that, "I would expect as customers are telling me, they want to get a return on investment on their 2G and 3G assets and that will be in the network a very long time." Doc. 92 ¶ 126. Plaintiffs claim that this statement was false or misleading because the robust sales of 5500s to AT&T were temporary and therefore Tellabs would not be in the network for a "very long time." But again, Plaintiffs' claim does not contradict Pullen's statement. Pullen referred to the length of time in which Tellabs products would remain in AT&T's network. He did not speak to the length of time that AT&T would continue to purchase Tellabs' 3G equipment. Plaintiffs do not allege any facts indicating that Pullen's prediction—that Tellabs products would exist as part of AT&T's 3G network infrastructure for "a very long time"—was false at the time or even in retrospect. Thus, Plaintiffs do not sufficiently allege that Pullen's statement was false or misleading. *Garden City I*, 2011 WL 1303387, at *27.

On the same call, Pullen was asked whether Tellabs might have experienced "some modest share shifting for Backhaul during the [second] quarter." Doc. 98-1 at 18. In response, Pullen said that any loss of market share was "very modest. Very modest." *Id*. Plaintiffs claim that, "[t]he shift was not 'modest'—it was actually severe. Tellabs knew that as a result of the new vendor, its highest margin products—the 8600/8800 would dramatically reduce AT&T sales and Tellabs did not have a replacement. These forecasts were provided to Pullen continually throughout the Class Period." Doc. 92 ¶ 128. But Pullen was asked about "share shifting" in the past tense; that is, during the second quarter of 2010. Plaintiffs' claim that Tellabs would

experience severe loss of market share in the future does not render Pullen's statement to have been false or misleading when made. "[A]n accurate report of past successes does not contain an implicit representation that the trend is going to continue." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997); *Galati v. Commerce Bancorp, Inc.*, No. CIV. 04-3252 (RBK), 2005 WL 3797764, at *7 (D.N.J. Nov. 7, 2005), *aff'd,* 220 F. App'x 97 (3d Cir. 2007) (statements about past performance "state nothing more than empirical facts. So long as those numbers are accurate, they cannot create Rule 10b-5 liability"); *Garden City II*, 2012 WL 1068761, at *10 (a statement that is, on its face, limited to the past is not actionable as a misleading projection of future performance).

Plaintiffs also claim that Pullen lied or misled the market when he stated, "we continue to perform well in this account" and "we're seeing growth on the embedded base[.]" Doc. 98-1 at 7, 18. Plaintiffs allege that these statements were false because "Defendants knew that they could not continue to perform well on the account, as they had aged and its top sellers, including the 5500 and 8800 were known to have an expiring shelf life." Doc. 92 ¶ 127. Plaintiffs further allege, "Tellabs knew that AT&T sales would began [sic] to fall precipitously—quite the opposite of seeing 'growth on the embedded base.'" *Id*. Again, this is an instance where Pullen made statements about Tellabs' success selling products to AT&T, but Plaintiffs allege that the statements were false or misleading because Tellabs' sales to AT&T declined in the future. "[A]n accurate report of past successes does not contain an implicit representation that the trend is going to continue." *Burlington Coat Factory*, 114 F.3d at 1432; *Galati*, 2005 WL 3797764, at *7; *Garden City II*, 2012 WL 1068761, at *10. Thus, Plaintiffs have not sufficiently alleged that anything in the July statements was false or misleading.

## C.     August of 2010

On August 12, 2010, Pullen again participated on a conference call with analysts. Since the July 27 call, AT&T had publicly announced the companies that would be its "domain suppliers." Tellabs was not included as one of AT&T's domain suppliers. On the August 12 call, when asked about concerns retaining AT&T's business, Pullen stated:

> First of all, and maybe most important, I can't speak for AT&T. You folks need to talk to them. But having said all that, what I will share with you is they're a very good customer. Our orders still remain very good, and we're approved in their mobile backhaul and obviously it's growing demand there. As I've shared on the earnings call, we do know that they're about to introduce a new vendor into the mix. But we continue to be deployed in their current business, and you know, it's a big and growing marketplace. We'll continue to do well there.

Doc. 98-1 at 102.

Plaintiffs allege that "the statement referenced . . . above was materially false and/or misleading because Tellabs' current business was not a growing marketplace." Doc. 92 ¶ 132. In this instance, Plaintiffs interpret Pullen's statements in a way that no reasonable person could read them. *Allscripts-Misys*, 778 F. Supp. 2d at 878. Pullen stated that the telecommunications marketplace or perhaps AT&T's telecommunications business was "big and growing." He did not say or imply that Tellabs' business from AT&T was big and growing. And by referring to "growing demand there," Pullen was referring to the demand on AT&T's network and thus the amount of infrastructure products AT&T would purchase from its suppliers. Pullen did not state that Tellabs' sales to AT&T were growing. Moreover, Pullen volunteered that AT&T was "introduc[ing] a new vendor into the mix," in the form of Alcatel-Lucent's forthcoming pure ethernet solution. Thus, Pullen's statement that Alcatel-Lucent would compete for AT&T's future business provides context for any forward-looking statement regarding Tellabs' sales to AT&T. Doc. 98-1 at 102; *Allscripts-Misys*, 778 F. Supp. 2d at 878 (context of statement is key

to determining whether it was false or misleading). In the context of the entire conference call and the w ell-known realities in the marketplace at the time, a reasonable investor would not conclude that Pullen had predicted growing sales to AT&T. *Id.* ("[I]n its actual context a reasonable investor would not arrive at the conclusion Plaintiff proposes.").

Moreover, Pullen's statements that Tellabs would "continue to do well" and that demand would grow are so vaguely optimistic as to be immaterial. Pullen did not say anything "that [was] so discordant with reality that [it] would induce a reasonable investor to buy stock at a higher price than it was worth ex ante. . . . [Pullen] put a rosy face on an inherently uncertain process; investors would have expected no less." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997); *Tellabs I*, 437 F.3d at 597 (defendant's statement that, "we feel very, very good about the robust growth we're experiencing" deemed too vague to be actionable); *Allscripts-Misys*, 778 F. Supp. 2d at 872 (defendant's "statements that [it] was 'confiden[t] in [its] ability to deliver solid results,' and was 'in position to capitalize' on a significant market opportunity amount to nothing more than vacuous management speak; they are therefore not actionable") (second and third alterations in original).

In further support of their claim that Pullen's statements were false, Plaintiffs reassert their stock allegations that "Tellabs' existing products had aged and its top sellers were known to have expiring shelf life," and that its "WiChorus based products never materialized." Doc. 92 ¶ 133. Again, the challenged statements do not include any reference to the shelf life of any of Tellabs' existing products or the viability of Tellabs' WiChorus products. So Plaintiffs cannot support their claim that Pullen's statements were false by citing such disconnected factual allegations. *Harley-Davidson*, 660 F. Supp. 2d at 1000 (dismissing the complaint because it

lacked "fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made").

Tellabs also stated in August of 2010 that it was pursuing a partnership with Juniper, one of AT&T's domain suppliers. Specifically, a Tellabs representative stated, "recently I was speaking with Kevin Johnson at Juniper and we have our products interoperating around the world for customers as well. And so our equipment's in their lab, we're doing interoperability testing with them for customers around the world, including AT&T." Doc. 92 ¶ 134. Plaintiffs allege that Tellabs was required to supplement this statement about Juniper with information "regarding Tellabs' aging technology, its inability to provide AT&T with new technology, and its declining AT&T sales." *Id.* ¶ 135. As with any omission, Plaintiffs can prevail on this theory "[o]nly if omitting the fact would make the statement so incomplete as to be misleading." *Harley-Davidson*, 660 F. Supp. 2d at 984 (internal quotation marks omitted) (citation omitted). Here, the statement regarding a potential partnership with Juniper had no direct connection to Tellabs' aging technology or other impending challenges such that anyone could find the statement misleading in light of the omission. But Plaintiffs also allege that the statement was false because "CW1 relayed that Tellabs refused to work with Juniper and decided to continue solely on its own, with AT&T then refusing to purchase products from [Tellabs]." Doc. 92 ¶ 136. But neither Plaintiffs nor CW 1 makes clear when Tellabs decided against partnering with Juniper. Merely pointing out that Tellabs eventually decided against a partnership with Juniper does not render untrue the statements regarding interoperability testing or a potential partnership. Plaintiffs do not allege that Tellabs products were not actually in Juniper labs or that Juniper and Tellabs were not considering a partnership in August of 2010. Thus, Plaintiffs' claims with regard to these statements fail.

### D.    January and February of 2011

Plaintiffs assert that "investors slowly began to learn the truth" on January 25, 2011, when Tellabs announced its Q4 2010 earnings. Tellabs reported revenues of $410.5 million during the final quarter of 2010, which was in line with the low end of the company's guidance of $410 to $430 million. But included in this number was approximately $30 million that, but for a few changes, Tellabs would have recognized in the following quarter.

First, Tellabs' revenues included almost $20.8 million that the company recognized during the fourth quarter of 2010 rather than the first quarter of 2011 as a result of a modified purchasing arrangement with a customer. Tellabs stated that when it set the fourth quarter guidance, it anticipated making this change. However, CW 9—Tellabs' Director of Supply Chain and Global Order Fulfillment, who contributed to the preparation of the company's quarterly financial forecasts and revenue reports—stated that senior executives did not decide to recognize the additional revenue until some point after they received internal revenue reports showing that the company was going to fall short of its target.

Second, Tellabs' fourth quarter earnings included $9 million that would have been recognized during the following quarter but for Tellabs "early-adopt[ing] two required accounting standards related to revenue recognition . . . for transactions originating or materially modified in 2010. These new standards generally result in earlier revenue recognition than under previous standards for certain deliverables in multiple-element arrangements." *Id.* ¶ 142. Plaintiffs claim that this "further artificially boost[ed] earnings." *Id.* ¶ 19. Analysts recognized that without these changes fourth quarter revenues would have been closer to $380 million, approximately 8% below the company's guidance. Doc. 98-1 at 14–15, 62. Tellabs

simultaneously projected first quarter 2011 revenues between $315 and $335 million, which was disappointing news for investors. On January 25, 2011, Tellabs' stock price fell by 19%.

Plaintiffs challenge two pages of single spaced block quoted statements by Tellabs, asserting again that "[t]he statements contained in ¶¶ 151–153 above were materially false and or misleading when made because by this time, Tellabs' existing products had aged and its top sellers were known to have expiring shelf life." Doc. 92 ¶ 154. But again, nothing in the block quoted statements contradicts Plaintiffs' assertions. Plaintiffs assert that "Tellabs continued to tout its sales and growth, fully knowing Tellabs' financials were in trouble and that sales would not continue to grow." *Id.* ¶ 149. But Plaintiffs do not connect this allegation to any contradictory statement by Defendants, as the PSLRA requires them to do. *Harley-Davidson*, 660 F. Supp. 2d at 1000; *Garden City II*, 2012 WL 1068761, at *5. In fact, none of Defendants' quoted statements from January of 2011 support the assertion that Tellabs was touting its robust sales. For example, Pullen said, "[i]n the fourth quarter, our Digital Cross-Connect and data revenue in North America declined. As a result, our revenue declined sequentially in the fourth quarter and will decline again in the first quarter." Doc. 92 ¶ 148. Therefore, Plaintiffs' overarching allegation with regard to these statements fails.

The only affirmative statement by any Tellabs representative from January of 2011 that Plaintiffs directly challenge is Wiggins' assertion that when the company set its guidance it anticipated changing the distribution arrangement with a customer that led to the early recognition of $20.8 million. But Plaintiffs only make this argument in passing, perhaps because whether the company anticipated adopting the financing arrangement when it set the projections, is clearly not material. "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the

company." *Tellabs I*, 437 F.3d at 596. Put another way, "there must be 'a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.'" *Id.* (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999)). Plaintiffs fall far short of demonstrating or even alleging a substantial likelihood that a reasonable investor would rely on or trade based on Pullen's statement that the company anticipated making the adjustment with its customer when it set its guidance for the fourth quarter of 2010. Nor does the timing of the company's decision significantly alter the total mix of information available to investors. Because the challenged statement was immaterial, Plaintiffs cannot proceed to discovery on this allegation.

Finally, Plaintiffs obliquely allege that Tellabs misrepresented its earnings when the company announced revenues of $410.5 million during the fourth quarter of 2010 because that number was "inflated" by Tellabs' early recognition of almost $30 million. Although Plaintiffs refer to Defendants' early revenue recognition as "questionable," Doc. 92 ¶ 103, and say that Tellabs' practices "merely inflated 4Q 2010 sales," *id.* ¶ 140, they do not allege that Tellabs committed fraud or violated Generally Accepted Accounting Principles by taking any of the actions that resulted in the company recognizing $30 million earlier than it otherwise would have.

But even if Plaintiffs had expressly alleged that Tellabs lied or misled the market when it reported $410.5 million in fourth quarter earnings, such allegations would still be lacking because Tellabs promptly explained the details surrounding the early recognition of revenues. In the press release announcing revenues, Tellabs included a section titled "[a]doption of new

accounting pronouncements," which explained the company's early-adoption of the accounting standards that increased the company's fourth quarter revenues by $8.8 million. And on the quarterly earnings call, Wiggins explained the impact of the company's arrangement with a customer that caused it to realize approximately $21 million during the fourth quarter of 2010 rather than in 2011:

> The second thing was we had a change in how we sell to a customer in North America for a product. It's now included with other products that had been previously sold through the distributor. The net result was that those orders for us occurred in 4Q, otherwise would have been in Q1. That was about $21 million. The sum of the two together of about $30 million.

Doc. 98-1 at 57. And the conference call transcripts make clear that analysts understood that, but for the company's changes in policy, fourth quarter earnings would have been closer to $380 million. Doc. 98-1 at 14–15, 62. Thus, Plaintiffs do not plausibly allege that Tellabs misrepresented its earnings when it announced admittedly accurate earnings and then immediately and accurately explained the changes from the status quo that resulted in those earnings. *Boca Raton Firefighters' & Police Pension Fund v. Devry Inc.*, No. 10 C 7031, 2013 WL 1286700, at *3 (N.D. Ill. Mar. 27, 2013) (dismissing claims premised on accurate reports of past earnings); *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 909 (N.D. Ill. 2001) ("Accurate statements of historical fact, such as past financial results, are not actionable."), *aff'd sub nom. Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001).

## III.    Scienter

In addition to alleging that Defendants made false or misleading material statements, Plaintiffs must also allege facts establishing Defendants' scienter— "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs II*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)). A court may find

that even though a plaintiff has adequately alleged that the defendant's statements were false or misleading, the complaint must be dismissed if the plaintiff has not adequately alleged scienter. *See Tellabs I*, 437 F.3d at 600. To satisfy the PSLRA's pleading standard with regard to scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. § 78u-4(b)(2). The Supreme Court has clarified that for an inference to be "strong" it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs II*, 551 U.S. at 324.

Because the Court has already found that Plaintiffs failed to adequately allege any material misstatements, the Court need not determine whether Plaintiffs satisfy the PSLRA's scienter requirement. *Premier Capital Mgmt., L.L.C. v. Cohen*, No. 02 C 5368, 2003 WL 21960357, at *9 (N.D. Ill. Aug. 15, 2003) ("Given the aforementioned deficiencies, the court need not address the sufficiency of plaintiffs' allegations regarding [Defendant's] scienter."). Nonetheless, for the sake of completeness, the Court will address the scienter element.

Initially, because Plaintiffs failed to demonstrate that any of the Defendants' material statements were false or misleading, they also cannot establish scienter. As discussed above, when read in the light most favorable to Plaintiffs, none of the allegations in the SAC—including the information from confidential witnesses, emails attached to the SAC, or Defendants' own statements—sufficiently allege that Defendants knowingly or recklessly made false or misleading material statements. Thus, Plaintiffs cannot allege that any of the Defendants acted with scienter in making misleading material statements. *Garden City I*, 2011 WL 1303387, at *28 ("In many ways, the analysis the Court has undertaken . . . above overlaps with the scienter analysis; for if Plaintiffs have failed to properly plead that any of [Defendant's]

statements were false or misleading, Plaintiffs could hardly allege that Defendants made false statements with the required state of mind.").  But even if Plaintiffs had adequately alleged misleading material statements, their deficient allegations of scienter would independently doom the SAC.

In addition to the allegations discussed above, Plaintiffs use two types of evidence in an attempt to bolster their allegations of scienter—that Defendants' motive to lie was clear from Wiggins' stock sales and Pullen's incentive payments.  While a motive to lie is not required to demonstrate scienter, *Tellabs II*, 551 U.S. at 325, it is relevant to the Court's determination, *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013) ("Without a motive to commit securities fraud, businessmen are unlikely to commit it.").

To establish this motive, Plaintiffs allege that because Wiggins owned and regularly sold Tellabs stock, he benefitted from artificially inflating the stock price during the Class Period.  As the Seventh Circuit has made clear, "because executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter."  *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008).  Plaintiffs insert into the SAC a summary of Wiggins' stock sales from "the 10.5 months leading up to the Class Period" as well as two preceding intervals.  Doc. 92 ¶ 14.  Plaintiffs allege that in the ten and one-half months preceding the Class Period, "Wiggins gained knowledge that AT&T was going with another vendor, [and] he began increasing his stock sales dramatically out of line with the two 10.5 month periods preceding that time."  *Id*.  But Plaintiffs do not provide any information about Wiggins' stock holdings or sales *during* the Class Period.  If Plaintiffs allege that Wiggins had incentive to inflate Tellabs' stock price because he could profit by selling stock during the Class Period, they should explain how much stock Wiggins sold during the Class Period.  *See Garden City I*, 2011

WL 1303387, at *30; *Harley-Davidson*, 660 F. Supp. 2d at 1001.  Plaintiffs allege that Wiggins

and others misled the market into inflating the value of Tellabs stock *during the Class Period*.

But if Tellabs' stock price was not artificially inflated until the start of the Class Period, it does

not support Plaintiffs argument to show that Wiggins sold more stock than usual before the Class

Period began.  *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001) (rejecting plaintiffs'

argument that the defendant's stock sale supported an inference of scienter in part because

defendants "sold too soon to be taking advantage of their allegedly fraudulent statements,

because the price increase allegedly caused by the fraud occurred after they sold").  Thus,

Plaintiffs' allegations regarding Wiggins' stock sales do not support a conclusion that Wiggins

had motive to mislead the market.

In attempting to demonstrate Pullen's scienter, Plaintiffs allege that because "75% of his

[year 2010] compensation was determined by the financial performance of the Company,

including specific financial benchmarks," Pullen had incentive to lie to achieve those

benchmarks.  Doc. 92 ¶ 15.  Plaintiffs further allege that the 2010 "benchmarks were largely met

by the premature recognition of revenue in 4Q 2010."  *Id.*  While this might be compelling

evidence of Pullen's motive, the facts alleged do not support Plaintiffs' claim.  First, Tellabs

narrowly failed to achieve two out of the four financial benchmarks used to determine Pullen's

compensation—the company fell less than half a percentage point below 34.3% operating

expense ratio and one percent shy of 30.4% growth product revenue in 2010.  Second, Tellabs

achieved the total revenue target by more than $42 million in 2010.  But Plaintiffs allege that the

early recognition of funds in 2010 amounted to only approximately $30 million, so it cannot be

said that Tellabs met this benchmark as a result of the early recognition of revenue.  As for the

fourth benchmark, the SAC states only that the company realized 48.3% total margin percentage

against a target of 45%. In sum, Plaintiffs do not demonstrate that Pullen received any additional money as a result of the company's "premature recognition of revenue" or any allegedly misleading statement. In light of all of the facts properly before the Court, Plaintiffs fail to demonstrate even a cogent inference of scienter, let alone one that is at least as compelling as competing inferences.

## IV.    Control Person Liability

In Count II, Plaintiffs seek to hold Wiggins and Minichiello liable under § 20(a) of the Securities Exchange Act because they were "controlling persons" as defined by the statute. However, because Plaintiffs fail to adequately plead a violation of § 10(b) or Rule 10b-5, their § 20(a) claims also fail. *Pugh,* 521 F.3d at 693 (dismissing plaintiff's control person claims because "to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b-5").

## V.    Dismissal with Prejudice

Finally, the Court must determine whether to dismiss the SAC with prejudice or whether to grant Plaintiffs leave to file a third amended complaint. When determining whether to dismiss with prejudice in the securities context, "each case must be evaluated on its own merit, in light of its own procedural history." *Fannon v. Guidant Corp.*, 583 F.3d 995, 1002 (7th Cir. 2009). When "plaintiffs had, as a practical matter, a number of opportunities to craft a complaint that complied with the standards of the PSLRA" and continue to fail, the Courts is "entitled to bring this litigation to a close with a dismissal with prejudice." *Id.*; *see also Pugh*, 521 F.3d at 583 (affirming a dismissal with prejudice of a second amended complaint); *Garden City II*, 2012 WL 1068761, at *14 n.7 (discussing *Fannon* and ultimately dismissing the case with prejudice after a previous dismissal without prejudice). Now before the Court is the third iteration of the

complaint.  The Court already dismissed the First Amended Complaint without prejudice.  In light of the facts alleged in the SAC as well as this case's procedural history, the Court finds that further leave to amend would be futile and thus dismisses the SAC with prejudice.

## CONCLUSION

For the above stated reasons, Defendants' motion to dismiss [94] is granted and the Second Amended Complaint is dismissed in its entirety with prejudice.

Dated: February 9, 2015

_____
SARA L. ELLIS
United States District Judge